SOUTHERN TRACTION CO. v. KIRKSEY.*
(No. 5512.)

(Court of Civil Appeals of Texas. Austin.
Nov. 24, 1915. Rehearing Denied
Dec. 22, 1915.)

RAILROADS ⟨⟩327 — DEATH AT CROSSING —
CONTRIBUTORY NEGLIGENCE.

Where plaintiff's decedent, while driving an automobile along a much-traveled highway and approaching a double crossing with a traction and a steam railroad, where trains and cars frequently passed to his knowledge, there being nothing to obstruct his view of approaching cars in ample time to avoid collision, ran without swerving from his course directly into a traction car as it was crossing the highway, he was guilty of contributory negligence.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 1043–1056; Dec. Dig. ⟨⟩327.]

Appeal from District Court, Hill County; Horton B. Porter, Judge.

Action by Mrs. Pearl Kirksey against the Southern Traction Company. Judgment for plaintiff, and defendant appeals. Reversed and rendered.

Templeton, Beall & Williams, of Dallas, and Wear & Frazier, of Hillsboro, for appellant. Shurtliff & Cummings, of Hillsboro, and Scott & Ross, of Waco, for appellee.

RICE, J. On the afternoon of May 9, 1914, James Kirksey, while returning in an auto from Dallas to his home at Hillsboro, was killed in a collision with a baggage car on appellant's interurban railway at Homewood, a small station on said road, where the highway from Dallas to Hillsboro crosses said railway; and this action is brought by appellee, his surviving widow, to recover damages on account thereof, alleging that appellant was guilty of negligence in running its car at a rapid rate of speed approaching said crossing, which was dangerous, without giving the usual signals. Appellant denied seriatim the material allegations of appellee's petition, and averred that it gave the customary signals before approaching the crossing, which its car was crossing in advance of said automobile; and likewise pleaded contributory negligence on the part of the deceased. There was a jury trial, resulting in a verdict and judgment for $5,000 in favor of appellee, from which this appeal is prosecuted.

It appears from the evidence that James Kirksey, the deceased, resided at Hillsboro, where he was then engaged, and had been for many years in the hotel business; that on the morning of the day in question he left Hillsboro in his machine for Dallas accompanied by his negro porter, Milton Graves; that he was familiar with the road he was traveling and the crossing where the accident occurred and had considerable experience in driving autos; in fact, was an expert driver. It seems that he left Dallas alone on his return home between 3 and 4 o'clock in the afternoon that he was killed,

reaching Homewood crossing, the place of the accident, between 6 and 7 o'clock; that it was a prairie country, generally level, in and about the crossing; that the highway does not cross the railway track at right angles, but runs east and west in a course about north 60 east and south 60 west, while the railway runs practically north and south. The Missouri, Kansas & Texas Railway at this crossing runs about parallel with the interurban, a short distance west of it. There were several houses just east of the crossing on the north side of the highway. The first was a barn about 18 feet high, with a fence partly of plank and wire around it, about 180 feet from the crossing; the next a shop, being a two-story building, some 25 feet high, and about 75 feet distant from the barn; the next is a chicken house, about 8 feet high, some 8 steps from the shop; the next is a toilet, three steps from the chicken house; the next a smokehouse, guessed to be about 8 feet high, between 4 and 5 steps from the toilet; then a well with a tree standing near it, which with its foliage at that point would furnish some obstruction to the view; and the next house east of this is the Preston dwelling, which is about 75 or 100 feet from the smokehouse. North of the barn is a little cabin used for cotton pickers, and still further north of this in the field is a negro house.

Deloach, the only eyewitness to the accident, states that he lives at Preston's house on the road near the station; that just before the accident he saw a man in an auto coming from towards Dallas, who proved to be the deceased; that he wanted to go to Redoak, a small town on the same road, and that he waived to the man in the auto who was approaching him, with a view of getting a ride; that on waving the second time the man slowed, looked toward him as if to stop, but did not do so; that the witness was then standing in the roadway in front of the shop, 90 or 100 steps from the crossing; that as the man drove by he heard the noise and rumbling of the interurban, and, looking, saw it approaching; that he watched the deceased, who kept driving down the highway towards the crossing until the collision occurred; that he slowed some, but did not stop the machine, and at the time of the collision was traveling at about the rate of 10 miles an hour, while he thought the train was approaching at the rate of about 60 miles an hour; upon the happening of the accident he ran immediately to the deceased, who had been thrown from the auto, and part of his head and body was in the cattle guard. Witness helped to get him out and drew the deceased's head into his lap and wiped the blood from his nose and mouth. Deceased was then breathing, but about dead. When witness reached the point of the accident the auto had been upset, but the

wheels were still turning and the machine was in gear. They did not stop turning until Mr. Preston cut it off. That from the barn, which was the nearest house, to the railway track was not less than 210 feet, and that a man traveling the road could distinctly hear and see the approaching train from any point after passing this barn. That the country was open, and one could see the train for half a mile approaching this crossing from the north. It was an open, prairie country, and no fences along the highway on either side. On the south of the roadway was a large open field, which had been planted in oats and was then in stubble. On the north was a cotton field, and a man driving an auto could easily turn out of the highway at that point. There was nothing to prevent any one traveling the highway from seeing the approaching train. From the crossing the highway ran some 600 yards east, then turned north. That he did not hear the whistle blow, but would not say that it did not blow. He testified that the interurban car was crossing the highway when the auto ran into it, striking it about the rear of the front trucks. That the auto did not stop or turn after passing him until it ran into the interurban. That when he first saw the interurban approaching it was something like 2½ trolley poles distant from the crossing, referring to the poles upon which the wires were strung, the distance between each of said poles being 150 feet.

The testimony of the conductor was to the effect that the car blew, on passing the whistling post, some 450 feet from the crossing; and another witness who was about the Preston place testified that he heard the whistle blow. The conductor further testified that the motorman on the interurban, who is now dead, made an effort to stop the car by applying the air before it reached the crossing. This was corroborated by Deloach. The conductor also testified that he saw the automobile coming, and when he first saw it the interurban and auto were about the same distance from the crossing, which he estimated to be about 3 poles' length, or about 450 feet. There was a gradual slope from about the crossing northward, and the track going north from the crossing was on a dump, and was slightly elevated. There was no timber, ravines, or anything that would obstruct the view of the car from one-half mile away, north of the crossing. The interurban cars were constructed of steel, very heavy, and made a great deal of noise. It likewise appears that the deceased was drinking while en route to Dallas, and during the afternoon while there, and that when he left Dallas he had two flasks of whisky in his auto, but no whisky was found in his machine after the accident, and both Deloach and the undertaker stated that they did not detect the smell of whisky about him. It was shown that this was a much-traveled crossing, and that two passenger cars passed each hour, and in the interval a baggage and express car, which fact was known to deceased.

Appellant asserts that the evidence is insufficient to support the verdict, in that it fails to show negligence on the part of the railway company, and likewise shows contributory negligence on the part of the deceased. We agree with appellant in this last contention. From all the facts and circumstances in evidence we are impressed with the belief that the deceased either saw, or by the use of ordinary diligence could have seen, the approaching train. He did not stop, but kept steadily driving after passing Deloach. If he had stopped, looked, or listened he would have heard or seen the train, because Deloach testified that by a glance in a northward direction he could have seen the approaching train. Deceased was familiar with the highway, its publicity and the frequency of the passing of trains thereover. He must have known the danger necessarily incident to an attempt to cross the track without looking or listening. If he saw or heard the train he must have been impressed with the belief that he could cross ahead of it. The evidence clearly shows that, instead of the train's running into the auto, the deceased ran into the train. At any rate, we think the facts show that the deceased was guilty of contributory negligence as matter of law, for which reason appellee ought not to recover. See Ft. Worth & D. C. Ry. Co. v. Harrison, 163 S. W. 332; St. Louis S. W. Ry. Co. v. Branom, 73 S. W. 1064; McDonald v. I. & G. N. Ry. Co., 86 Tex. 1, 22 S. W. 939, 40 Am. St. Rep. 803; Railway Co. v. Edwards, 100 Tex. 22, 93 S. W. 106; I. & G. N. Ry. Co. v. McDonald, 75 Tex. 41, 12 S. W. 860; Houston, B. & T. Ry. Co. v. Rucker, 167 S. W. 301; T. & P. Ry. Co. v. Marrujo, 172 S. W. 588; Butler v. R. T. & C. Street Ry. Co., 99 Me. 149, 58 Atl. 775, 105 Am. St. Rep. 267; New York Central v. Maidment, 168 Fed. 21, 93 C. C. A. 413, 21 L. R. A. (N. S.) 794; Mynning v. Detroit, L. & N. Ry. Co., 59 Mich. 257, 26 N. W. 514; Duerler Mfg. Co. v. Dullnig, 83 S. W. 889; Sherman & Redfield on Neg. par. 57; I. & G. N. Ry. Co. v. Garcia, 75 Tex. 583, 13 S. W. 223.

Believing that the case has been fully developed, it becomes our duty to reverse the judgment of the court below and here render judgment in favor of appellant, which is accordingly done.

Reversed and rendered.