ST. LOUIS, B. & M. RY. CO. et al. v. PAINE. (No. 603.)*

(Court of Civil Appeals of Texas. El Paso. Oct. 19, 1916. Rehearing Denied Nov. 9, 1916.)

1. APPEAL AND ERROR ☞274(6)—FINDINGS OF FACT—EXCEPTION TO JUDGMENT.

An exception to the judgment is sufficient to authorize a challenge of the trial court's findings of fact.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 1639; Dec. Dig. ☞274(6).]

2. APPEAL AND ERROR ☞750(7) — ASSIGNMENTS OF ERROR—FINDINGS OF FACT.

In an action for damages to an automobile, assignments of error that the driver was guilty of contributory negligence under the undisputed testimony, and, there being no evidence of discovered peril, there should have been no recovery, and that the evidence was insufficient to support any allegation of negligence contained in the petition, directly challenged the trial court's findings of facts in favor of the plaintiff.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 3074; Dec. Dig. ☞750(7).]

3. NEGLIGENCE ☞136(14) — QUESTION FOR JURY.

The general rule is that negligence is a question of fact for the jury, but the courts may declare some acts to be so obviously dangerous and reckless as to constitute negligence per se.

[Ed. Note.—For other cases, see Negligence, Cent. Dig. §§ 305, 306, 316, 318, 320; Dec. Dig. ☞136(14).]

4. RAILROADS ☞328(6)—ACCIDENT AT CROSSING—CONTRIBUTORY NEGLIGENCE.

The driver of an automobile, who neither looked nor listened for the train that struck him, nor paid any attention to the warning given him, but ran his car on a track immediately behind a receding train without trying to ascertain whether there was another train to pass immediately in the other direction, was guilty of such negligence as to preclude a recovery for damages to the automobile.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 1063; Dec. Dig. ☞328(6).]

5. RAILROADS ☞348(1)—ACCIDENT AT CROSSING—DISCOVERED PERIL—EVIDENCE.

The admission of the driver of an automobile struck and damaged by defendant's train that he saw the approaching train 20 feet away when he was proceeding slowly and could have stopped in 3 feet, but that he did not reverse because he thought the quickest way was to go ahead, was, in effect, an assertion that there was no discovered peril.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 1138, 1140, 1141; Dec. Dig. ☞348(1).]

Appeal from District Court, Harris County; Wm. Masterson, Judge.

Action by H. A. Paine against the St. Louis, Brownsville & Mexico Railway Company and Frank Andrews, receiver, and others. Judgment for plaintiff against the St. Louis, Brownsville & Mexico Railway Company, and the receiver and the .railroad appeal. Reversed, and judgment rendered for defendants.

Andrews, Streetman, Burns & Logue, W. L. Cook, and Coke K. Burns, all of Houston, for appellants. Love, Channell & Fouts, of Houston, for appellee.

HARPER, C. J. This is an appeal from a judgment for $800 damages to an automobile in favor of appellee against St. Louis, Brownsville & Mexico Railway Company, and Frank Andrews, receiver; and in favor of the Houston Belt & Terminal Railway Company, Gulf, Colorado & Santa Fé Railway Company, and Trinity & Brazos Valley Railway Company, and in favor of appellee. Tried without jury. St. Louis, Brownsville & Mexico Railway Company, excepted to the judgment and gave notice of appeal.

[1, 2] Two· assignments are urged:

(1) The driver of the automobile being guilty of negligence, under the ·undisputed testimony, and there being no evidence of discovered peril, there should have been no recovery.

(2) The evidence is insufficient to support any allegation of negligence contained in plaintiff's petition.

The appellee urges that, the case having been tried without jury and the court having filed conclusions of law and facts, such findings are binding upon appellant in the absence of challenge by assignments of error.

An exception to the judgment is sufficient to authorize challenge of findings of facts by trial court. This the record shows was taken. Voight v. Mackle, 71 Tex. 78, 8 S. W. 623. And we think the assignments here presented are a direct challenge of such findings.

The acts of negligence charged to be the proximate cause or causes of the accident and injury to the automobile are, in substance, as follows: (1) Defective crossing; (2) failure to have a watchman; (3) operating the train at a speed in excess of that allowed by ordinance; (4) failure to blow whistle and ring bell; (5) failure to slacken speed of the train upon discovering the peril.

The defendants plead contributory negligence of the driver of the machine: (1) Because he failed to make proper lookout before going upon the track; (2) failed to note the approach of the train, warning of which was given by flash of headlight, by bell, and whistle; (3) and because of his failure to heed warnings given by persons in the vicinity of the crossing to stop.

Appellee, in answer to appellants' charge of contributory negligence, pleads: (a) The nearness of certain alleged switch engines on an adjacent track, which engines it is claimed were making noises suggestive of probable movement; (b) the driver's mistake or confusion as to the signals given, in that he associated said signals with an alleged expected movement of said engines; (c) the presence of a bright arc light at the crossing which counteracted the effect of the headlight and prevented the driver from noting the approach of the train; (d) the passage of an inbound train just preceding the effort to cross, which it is claimed added to the confusion.

### Findings of Facts.

"I. On the 8th day of August, 1912, the appellants owned and maintained railroad tracks upon which they operated their locomotives and trains across a public street and thoroughfare in the city of Houston, and which was then, and had been for a long time prior thereto, constantly used by the public in said city of Houston as a public street and thoroughfare for the purposes of travel.

"II. At the point where defendants' line of railroad crosses said street, it maintained four railroad tracks, two tracks known as main line tracks, and two known as switch tracks or side tracks. The two main line tracks were located south of the switch tracks, the main line track known as the outbound track being south of and approximately 8 feet from the other main line track known as the inbound main line track. The tracks or roadbed at the point where the same crossed said street was about 2½ or 3

feet higher than the street on either side of it, there being quite an abrupt approach. There were depressions between the rails of the railroad tracks of from 6 to 12 inches, the surface of the street between the tracks being lower than the top of the rails, which rendered the crossing over the tracks rough and difficult to travel over with an automobile or other vehicle.

"III. On said day, about 9 o'clock in the evening, George E. Ayers was driving the automobile for damages to which this suit is brought along said street, going from the north to the south."

He described the accident as having occurred in the following manner:

"In the car was myself, and wife, my wife's sister, and Otis Paine. As I approached that Sampson street crossing on the occasion in question, I saw a passenger train coming into town; it hadn't got to the crossing when I first saw it. When I saw it, I stopped. That train was coming in very slowly. I pulled up a little closer to the train, and just after it passed, as I was going across, another train coming in the opposite direction hit us. The other train was also a passenger train coming in the opposite direction from the one I first saw coming into town. I suppose that train was coming over the same railroad as the first one was. There are four tracks at the place of the accident, and the inbound train was on the third track, and the outbound train on the fourth track. It was the outbound train that collided with us.

"After the inbound train crossed, I did not see any other train going out; the reason I didn't was there were two switch engines standing on the two other tracks with their headlights lighted and steam blowing off. The switch light, too, was lighted, and with all this noise and light I couldn't see this other headlight; and they were all ringing their bells. I judge those two switch engines I have mentioned were standing about 60 feet from where I was, on the left side of me as I was going out. I was going from town out to my home. In other words, these switch engines were standing east of the Sampson street crossing and were apparently standing there waiting for this train that was pulling in. When I started across, I was watching for those switch engines to come up on that track.

"When I first discovered the train that struck us it was about 20 feet away from us. When I saw it at first, I had my car in low gear, and I tried to get across, but I did not get across. The reason I didn't stop and reverse and try to back is because I didn't have time. I thought the quickest way was to go ahead.

"The condition of that crossing there with reference to getting over it quickly or otherwise was it was or would have been impossible to have gone over the track in high gear; I couldn't have done it, and in fact we always changed the gear to make the crossing. There were no boards on the track. It was just merely filled with shell, and oftentimes where it would be down at the bottom of the rail you would have to raise entirely over the rail.

"Low gear gives the car more power and enables you to make it over rough ground. If the street there had been comparatively smooth and the railroad tracks had been on a practical level with the surface of the street, I could have escaped that train and not been struck.

"I stated that in approaching this crossing on Sampson street I noticed the inbound train. When I first noticed that train, it was, I should say, about 200 or 300 feet from the crossing, while I was about 75 feet from the crossing. I stopped before I got to the crossing. In other words, I got to where I stopped and waited for that train before it got there. The train covered a distance of possibly 150 feet after I came to a stop before it ran in front of me, or perhaps 100 feet. I guess I stopped within 25 feet of the track that train ran upon. As to wheth-

er I said, before the train got entirely off the crossing, I pulled up closer, why, I stopped on the other side of the tracks first before I got on the railroad. There are four tracks at that crossing, and there were two of those tracks between me and this inbound train at the time I stopped. The train was on the third track. The distance from us, when we were standing there, to the track this train was running on, was about 75 feet the first time I stopped, but I stopped again before making the crossing. I stopped on the second track then. When I stopped the second time, I should say I was then 25 or 30 feet from the track this inbound train was on. I stood there when I made that second stop until the train had passed, and that train was running very slowly, so I judge I stood there 3 or 4 minutes before I started again. The train, as I said, was on the third track, and after it had passed I started again. I did not start like that (counsel snaps finger) after the train had gotten away from the crossing, but I expect 30 or 40 seconds elapsed before I did start. The train had gotten about 30 or 40 feet away from me when I started the second time.

"The train which struck us was on the track just beyond the third track. My opinion is that train was running about 25 or 30 miles an hour, and it hit me just as I got on the fourth track it was on; it struck me just as I got on that track. Certainly I had seen that train before it hit me; I am positive of that.

"There were two engines standing down to my left, but I don't know whether they were switch engines or not. Those engines were on tracks Nos. 1 and 2. In designating these tracks by numbers I am numbering from the north side of Sampson street, i. e., from the side I approached. There were several tracks that branched off from that, and there might have been some switch engines there, but these two engines I have spoken about were on tracks 1 and 2, and I should say 75 to 100 feet to my left, approximately.

"The inbound train came in on track No. 3, numbering those tracks from the direction I approached, and the outbound train went out on track No. 4. The switch engine on either track 1 or 2 did not interfere with our crossing tracks 3 or 4. As to whether I told the court a while ago I was afraid one of those engines would bear down on us, why, they were ringing their bells and blowing their whistles, the steam, and the men were halloaing. It is a fact that what they were trying to do was to keep us from going across there and getting hit by that train; that is what they were doing, but they attracted my attention. There was not a man there at the crossing trying to stop me; there was no one right in the street trying to stop me. It is not a fact that I came mighty near running over a man to get by there.

"It is not a fact that I saw this outbound train and thought I could make it and tried to get across. I do insist that I got on the track before I realized that that train was coming. It is certainly not a fact that I didn't stop at all, and that I just kept going from the time I got anywhere near that crossing until I got hit.

"I stated that I had my car in low gear when I went to make that crossing. I do not make railroad crossings on high gear unless the road is in condition. My general practice about that is I make all roads that are in good condition on high gear; all that are not, in low gear. I don't mean them on high speed, but I mean on high gear; there is a difference between the two. On the occasion in question, however, I made that crossing on low gear. It was about an hour before this accident that I had made it on high gear. I did it frequently, about three times a day. I knew the condition of this Sampson street crossing, and knew that I had to make it on low gear. I knew that when I first went on the track. I knew all the time

I was going to have to use low gear. I was going from 4 to 6 miles an hour when I made that; I mean when I made it in low gear. I do claim to be an expert automobile driver. You could stop a car going from 4 to 6 miles an hour in the space of about 3 feet.

"The brakes were in good condition on this brand new Paige car. You couldn't stop a car instantly by just planting your foot on the brake; you can't stop any moving object instantly. But, as I have said, you could stop a car going from 4 to 6 miles an hour in the space of about 3 feet.

"In going on that crossing, Waddell's warehouse was to my right. I cannot say whether that warehouse was on the property line, but I know substantially where it was. I couldn't say whether it was on the railroad right of way, because I don't know where the right of way is. It is not a fact that after I got even past track No. 1 or on track No. 1, going across, that the Waddell warehouse obstructed my view, but the box cars did. In fact, I did not get across track No. 1 until I was hit. I was standing on track No. 1 before I started the second time. I do not remember whether there were any box cars after I passed track No. 1. I won't say that there were. The box cars I am talking about were on track No. 1. I won't say there were any on the other tracks. I do not know that there is anything that I can recall between tracks 1 and 4 that deprived me from seeing the inbound train."

Mrs. Geo. E. Ayers testified in substance and in part as follows: Witness was in the automobile with Mr. Ayers at the time it was damaged at the Sampson street crossing on the night of August 8, 1912. As they approached the Sampson street crossing, they stopped on the first switch and waited until the inbound passenger train passed. After that incoming train had passed they started again; started slowly; after that incoming train had passed, they started in low gear, or, as some people call it, "first speed." Witness saw two switch engines standing over to their left, and supposed that there were two men with each of those engines, as there usually is. The steam was coming from those engines. She did not see anybody say anything or do anything as they started to go on across the track; saw no one making a signal; did not see a man with a lantern; did not see them down there by those switch engines to their left with lanterns, and saw no signals given; did not hear any one say, "Halloa," to them to stop, or to look out, or anything of that kind. Witness did not hear the train that struck the automobile; the first she knew about its coming was just as the first wheels of the automobile were on the track, and the engine then hit it. Of course, as witness states, they saw it before it hit, but there was nothing they could do; it was just in an instant; it hit just the minute they saw it. Witness estimates the speed of the train at about 25 or 30 miles an hour. Witness heard no bell ring or whistle blow, except by the inbound train. Those switch engines were making a noise with the exhaust.

On cross-examination witness further testified as follows:

"We were in low gear at the time we got on this track that night. We had stopped on one

of the switch tracks to wait for the Santa Fé train to pass. We stopped on the first switch track we got to. We did not stop again then before going on the main line. When we stopped on the switch that was our second stop, and, immediately after the Santa Fé train passed, we started up and kept going until the accident. I couldn't see the Brownsville train which struck us before we got on the track. We looked down the track to see just as soon as we could; we always do that, look both ways. We looked both ways that time before letting on this second track. We looked just as soon as we could. We looked to the left. We looked both ways as soon as we could.

"I did know there were two tracks there, and I suppose I also knew that if a train were coming on that far track this train coming in would obstruct the view; I suppose that is obvious. We were standing on the switch track when the inbound train was coming in. We had crossed the inbound track, or rather I mean to say we had to cross the inbound track before we got to the outbound track, but if I would look up that inbound track I could see nothing but the back end of the train that passed even after we got on the same track with it. I don't see how I could see anything on the other track at all. (Hands her white sketch.) This is Sampson street, and this is north, and we were coming in this direction. You say there is a distance of 7 feet and 8 inches between the rails of the inbound and the outbound tracks, main line tracks, and your question is whether or not I looked, after the automobile got on the inbound main line, to determine whether or not a train was coming down the outbound main line. Well, you see when we were on this track, just as our engine was past that track, we couldn't see up here until we got almost on this track, but we had to keep coming, and every inch we came further gave us a better opportunity to see.

"I do not see how it could be a fact that, just as our front wheels got on the outer rail of the inbound track, we would have been bound to see this outbound train coming; I don't see how we could have seen it. I suppose what would prevent us from seeing it is distance.

"We were standing on the switch track waiting for that Santa Fé train to pass; that was the train we were waiting to get by. As the back coach of that Santa Fé train began to cross the street, we started, but we had another track to cross, you see, to get to this place.

"That Santa Fé train wasn't going so fast, not as fast as the one going out. Oh, my, no, we were not going as fast as the Santa Fé train. We were going very slow. I couldn't tell you how far the Santa Fé train had gone past us when we got upon that track, because it kept on going, you know. It was some distance, and it kept on going. It was not anywhere near the length of a coach down the track by the time we got behind it.

"We did stop on the first switch track, and we started just as the Santa Fé train cleared the crossing. We were running much slower than the Santa Fé train, and I still think, notwithstanding we had to cover that distance, that that Santa Fé train was not a car length from us when we got behind it."

Witnesses testified that a man stood in the street in front of the approaching automobile and waved a lantern prior to its reaching the place of danger and halloing for it to stop, and further positive testimony that the bell of the train that struck the automobile was being rung and the whistle had blown, and it had a bright headlight. There is no contradiction of this evidence, except that the driver and other occupants of the car did not see nor hear anything of the sort.

[3, 4] The courts say that the general rule is that negligence is a question of fact for the jury, but the courts can and do declare some acts to be so obviously dangerous and reckless as to constitute negligence per se. The facts show clearly that the driver of this automobile neither looked nor listened for the train which struck him, nor did he pay any attention to the warning indisputably given him, but ran his car upon the track immediately behind the receding train, when its rear end had gone 40 or 50 feet, not more than two car lengths from him without in any way trying to ascertain whether there was another train to pass immediately in the other direction, and such acts upon his part constitute such negligence as to preclude a recovery in this action. Railway v. Bracken, 59 Tex. 73; Railroad Co. v. Houston, 95 U. S. 702, 24 L. Ed. 542; Railway Co. v. Edwards, 100 Tex. 23, 93 S. W. 106.

[5] Again, the driver admits that he saw the approaching train, which struck his machine, approximately 20 feet away, that he was proceeding slowly, the brakes were in good order, and that he could have stopped in three feet; and yet he says that he did not reverse and go back "because I didn't have time. I thought the quickest way was to go ahead." This is in effect an assertion that there was no discovered peril, and there is no evidence in the record that appellants' employés discovered the automobile in time to have stopped the train.

The judgment will be reversed, and as the facts appear to be fully developed, and show so clearly that plaintiff is not entitled to recover, it will be rendered for defendants.