## CHICAGO, R. I. & G. RY. CO. v. JOHNSON.
### (No. 9190.)

(Court of Civil Appeals of Texas. Ft. Worth. Dec. 20, 1919. On Motion for Rehearing April 20, 1920.)

1. **Railroads** &#9758;348(4)—**Finding of omission of signals justified by testimony.**

Testimony by several witnesses that they did not hear crossing signals, though they could and would have heard them if they had been given, though negative in character, is sufficient to support a special verdict that the signals were not given against testimony of the employés and other witnesses that the whistle and bell were sounded as required by statute.

2. **Railroads** &#9758;348(8)—**Finding of automobile's speed warranted by evidence.**

In an action for death in a collision between a train and an automobile, evidence by defendant's witnesses that the automobile was running 15 miles an hour when approaching the crossing, but they could not say whether it reduced speed, and by plaintiff's witnesses that it was running very slowly, *held* to support special verdict, finding that speed was reduced to six miles an hour, as required by Acts 1917, c. 207, § 17.

3. **Railroads** &#9758;346(6)—**Defense has burden of proving automobile driver's violation of speed regulation.**

In an action for injuries in a collision between a train and an automobile, the burden

is on defendant to show by a preponderance of the evidence that the driver of the automobile violated Acts 1917, c. 207, § 17 (Vernon's Ann. Pen. Code Supp. 1918, art. 820*l*), requiring him to reduce his speed to six miles per hour.

**4. Negligence ⊚⟶93(1) — Driver's negligence not imputed to passenger.**

Negligence of the driver of a private vehicle in approaching a railroad crossing is not ordinarily chargeable to other occupants of the vehicle while riding at his invitation or with his consent.

**5. Negligence ⊚⟶93(1)—Automobile passenger held engaged in joint undertaking with driver.**

Where plaintiff and her husband were going to the city on business, and accepted an invitation from a brother-in-law to ride in his automobile, as he was going to take his sister to the city, the driver and plaintiff's husband were not engaged in a joint undertaking so as to render his negligence imputable to them.

**6. Evidence ⊚⟶574—Plaintiff's conclusion that parties were engaged in joint undertaking not conclusive, where circumstances showed contrary.**

Where plaintiff testified to the circumstances under which she and her husband were riding in an automobile of another, which collided with a railroad train, her statement that they and the driver were engaged in a joint undertaking was a conclusion which did not establish that fact, where the circumstances showed the contrary.

**7. Railroads ⊚⟶350(21)—Negligence of automobile passenger in relying on driver held question for jury.**

In an action for the death of plaintiff's husband in a collision between an automobile and a train, where plaintiff and her husband were guests of the driver, evidence, showing that plaintiff had no recollection of the accident in which all other occupants of the car were killed, and no one else saw them just before the accident, *held* insufficient to establish as a matter of law negligence by plaintiff or her husband which contributed to his death.

**8. Death ⊚⟶99(4)—$12,000 for death of young farmer held not excessive.**

In an action for the death of plaintiff's husband, a verdict, reduced by the trial court from $30,000 to $12,000, was not excessive, where it appeared that the husband was 29 years old, in good health, and a hard-working farmer, cultivating land as a share cropper, though previously he had worked as a hired hand at $20 or $30 per month.

On Motion for Rehearing.

**9. Appeal and error ⊚⟶999(2)—Excessive verdict held to show bias, which indicates bias in finding against contributory negligence.**

Where the jury found against contributory negligence, though the evidence almost conclusively established such negligence as a matter of law, and also rendered a verdict for $30,000 damages, which the trial court reduced to $12,-000, the excessive verdict manifests such bias as indicates that the finding on contributory negligence may have also been due to bias, and the verdict should be set aside.

Appeal from District Court, Tarrant County; R. E. L. Roy, Judge.

Action by Maud Johnson against the Chicago, Rock Island & Gulf Railway Company. Judgment for plaintiff, and defendant appeals. Reversed and remanded on motion for rehearing.

Lassiter & Harrison and R. M. Rowland, all of Ft. Worth, for appellant.

McLean, Scott & McLean, of Ft. Worth, for appellee.

DUNKLIN, J. An automobile was run over by a passenger train of the Chicago, Rock Island & Gulf Railway Company a short distance north of the corporate limits of the city of Ft. Worth. There were five occupants of the automobile at the time of the accident, viz. A. A. Simmons, the driver, A. J. Johnson, Mrs. Maud Johnson, his wife, Mrs. Brewer and her little daughter, all of whom were killed in the accident except Mrs. Maud Johnson. Mrs. Johnson and Mrs. Brewer were daughters of W. A. Taylor, who was also father-in-law of A. A. Simmons. At the time of the accident, the party was on their way to Ft. Worth from the home of W. A. Taylor, which was about 20 miles north of the place of the accident. This suit was instituted by Mrs. Maud Johnson, the only survivor of the accident, for the death of her husband, A. J. Johnson, and from a judgment in her favor, the defendant has prosecuted this appeal.

The place of the accident was where the railroad track which runs practically north and south, was crossed by one of the public roads of Tarrant county, running in an easterly and westerly direction. The Pierce-Fordyce Oil Company maintains a plant in a northeasterly direction from the crossing, and in close proximity thereto. In connection with the plant, it maintains a small lake of water which is held by a dam running practically parallel with the public road and near the north side thereof. The west end of this dam extends practically to the east line of an embankment constructed on the railroad right of way and upon which the railroad track is built. This embankment, which ran parallel with the track, is about 50 feet east of the center of defendant's track. The automobile was traveling west, having left a road running north and south, and approached the crossing from a hill, there being a fall or decline down to a depression across which the dam was constructed. The accident happened about 3 o'clock in the afternoon on a clear sunshiny day, with but little, if any, wind.

As a basis for the recovery sought, plaintiff alleged that the railway company was guilty of negligence in failing to give the statutory warnings of the approach of the train to the crossing, and in running at a high and dangerous rate of speed, which negligence was the proximate cause of the accident. The defendant pleaded contributory negligence on the part of the plaintiff and her husband in failing to keep a lookout for the approach of the train, and in failing to have the driver of the car stop the same before reaching the crossing, it being alleged in that connection that the approaching train was in plain and open view of the occupants of the car for some distance east of the crossing; that the warning signals prescribed by the statutes were given by the operatives of the train, and that had the occupants of the car stopped and looked or listened before reaching the crossing, as it was their duty to do, the approach of the train would have been discovered and the accident would have been avoided. It was further alleged that Simmons, the driver of the automobile, was also guilty of negligence in failing to stop and look and listen before he reached the crossing, and after the train was in plain view, and that but for such failure the accident would not have happened. It was further alleged that on the occasion of the accident plaintiff and her husband and Simmons, the driver, were making a trip to Ft. Worth on a common or joint enterprise, for the benefit of all, and therefore the negligence of Simmons, above noted, was legally chargeable to plaintiff and her husband also.

The case was tried before a jury who, in response to special issues submitted, found that in approaching the crossing the operatives of the locomotive failed to sound the whistle or ring the bell, as required by the statutes, and that such failure constituted negligence, which was the proximate cause of the death of A. J. Johnson. In response to other special issues, the jury exonerated plaintiff and her husband and also Simmons, the driver, from the charge of contributory negligence, alleged in defendant's answer. There was a further finding of damages sustained by plaintiff by reason of the death of her husband in the sum of $30,000, for which amount judgment was rendered, but later, upon being required so to do by the trial judge, plaintiff filed a remittitur of $18,-000, thus leaving the final judgment in plaintiff's favor for the sum of $12,000.

[1] Several witnesses, including the engineer and fireman and others who were not employés of the railway company, testified positively to the effect that the locomotive whistle and bell were sounded at the distance from the crossing and in the manner required by the statutes. The plaintiff introduced several witnesses, who were in positions where such signals could have been heard by them, all of whom testified substantially to the effect that they did not hear such signals, and that, had the same been given, they could and would have heard them. While such testimony so offered by the plaintiff was perhaps negative in character, yet we are unable to say, as insisted by appellant, that it was insufficient, as a matter of law, to overcome the positive testimony offered by the defendant upon that issue.

According to the testimony of one of the witnesses, which seems to be uncontroverted, there were some small willow trees growing on the Pierce-Fordyce property along the edge of the embankment, which was on the east line of defendant's right of way, and the dam which held the water in the company's reservoir or lake was about 200 yards in length. It seems to be undisputed that along this water dam at its highest portion, which was at the lowest depression of the draw, for a distance of 50 or 75 yards, at least, a person traveling west along the public road could not see a train approaching from the north, the view being obstructed by the dam. According to the testimony of witnesses offered by defendant, which testimony seems to be strengthened by photographs included in the statement of facts, the occupants of the automobile had an unobstructed view of the approaching train at a distance of at least 137 feet east of the crossing, and, from that point on to the crossing, and, according to some of those witnesses such unobstructed view of the approaching train was placed at a few feet farther from the east of the crossing; but according to testimony of witnesses introduced by plaintiff, the occupants of the automobile could not have seen the approaching train at a greater distance east of the crossing than 30 or 40 feet. The railway track is practically straight and open to view to any one favorably located on the right of way for a distance of about one-fourth of a mile north of the crossing. The automobile did not stop, and there was no evidence that the driver attempted to stop it before it reached the crossing. The lowest estimate by any witness of the speed of the train as it approached the crossing was 40 miles per hour, and some of the estimates were 50 miles per hour.

J. W. Strickland, who was a watchman at the Pierce-Fordyce Company's plant, was at the gate opening into the plant from the road which was being traveled by the automobile at the time, and that gate was some 200 yards east of the railroad crossing. He testified that in his opinion the automobile was traveling at about 25 miles an hour when it passed that gate. He further testified as follows:

"As to whether it decreased its speed any or increased it or held about that average rate of

speed as it went down the road, will say I suppose it was about the same as far as I could tell. I never paid much attention to it until I saw it was about the track—I thought it had time to get by. I saw the accident or collision as they came together. I saw it hit, but I couldn't tell just how fast it was running at the time it was hit, when the train hit it. I was standing right on a line with it, and I couldn't tell about how fast it was going. I couldn't say whether the automobile slackened its speed any or not."

R. C. Friend, baggageman on the train at the time, testified by affidavit, which was admitted in evidence, being offered by defendant, as follows:

"I was sitting in the baggage car door when I first noticed the auto traveling west at a point about one-eighth of a mile east of the crossing. I watched it disappear from view under the top of the reservoir fill, again coming into view at the end of the fill, for a distance of about 50 feet till it again disappeared in front of the engine and was struck. I don't think we were running over 40 miles per hour, and the auto was traveling 12 or 15 miles per hour, and did not slack speed as it came upon the track, without doubt never having seen or heard the approaching train."

Charles Morris, the fireman on the locomotive of the train, introduced by defendant, testified:

"I know that embankment is there just south of the Pierce-Fordyce plant that runs up practically to the east edge of the Rock Island right of way. As we were coming down there as to when and where I first saw the automobile with reference to the edge or end of that embankment, will say I have an idea about halfway between the edge of the embankment and the track. The automobile was running at the time I saw it. I never saw the car long enough to tell anything; hardly long enough to draw any judgment on that, but I have an idea it was running about 15 miles per hour."

The engineer was looking out the west window of his cab, and hence did not see the automobile until after the collision; and the foregoing three witnesses, Strickland, Friend, and Morris, were the only witnesses offered by defendant to prove the speed of the automobile as it approached the crossing.

Plaintiff testified, in part, as follows:

"I was in that wreck. I do not remember of seeing or hearing a train of any kind on that occasion. I don't know that I was· in the wreck, other than what I have been told. I don't have any recollection about being in the wreck. The last thing I remember on that day that I can call to mind now is I remember going along that oil plant. The last I remember is just noticing the south of the oil plant, just looking out in the prairie there. I know where the dump is that leads on down north of the road on up to the railroad tracks—that is, I have just seen it at a distance since then; I haven't been over it since. At the particular time of the accident I know that Mr. Simmons

was driving very slowly along there; I remember that. * * * My husband didn't have anything to do with the running of the car."

Plaintiff further testified that in traveling the 20 miles distance from her father's home the automobile had not been running more than 8 or 10 miles an hour up to the time they turned into the road running west to the crossing. She further testified:

"The car was going slower after we began passing along the south side of the Pierce-Fordyce property; we were going slower along going west. As to the last place that I remember of when we were traveling along there and going slow, will say along south there, all along there, I remember we were going slow. We were on the west side there at the Pierce-Fordyce plant when I remember that the car going slow, and I remember that we had passed the gates there at the time. We were on the south side of the Pierce-Fordyce property and on the west side of the gates—had done passed the gates at the time I have the recollection of going slow. I don't remember seeing the gates, but I remember we done passed the main part of the buildings at the time. I don't remember whether we got to the east end of the dump or not, the embankment of the Fordyce property, before this blank came to my memory; I don't remember anything about it. I don't know whether we got that far west or not. As we were passing along there we had been talking to one another. The last we had been talking was just after we had turned the corner coming west. We quit talking then, and I don't remember saying anything else. As we traveled along there and passed the gates we were all in silence."

Azra Mae Ryan, a little girl who, with other children, was gathering flowers near the railroad just north of the crossing at the time, testified:

"At the time saw it, that car was about as far from the railroad track as from here to where you are sitting (indicating), and it wasn't going very fast; it was going pretty slow."

[2] In view of the testimony referred to, we are unable to say, as insisted by appellant, that there was no support in the evidence for the finding of the jury that the automobile was brought to a speed of not more than six miles an hour at a distance of at least 30 feet before it reached the crossing, and that therefore Simmons was guilty of contributory negligence, as a matter of law, because he was running the car in violation of section 17, chapter 207, Acts of the Legislature of 1917 (Vernon's Ann. Pen. Code Supp. 1918, art. 820*l*), which reads as follows:

"Any person driving a motor vehicle or motorcycle, when approaching the intersection of a public street or highway with the tracks of a steam railroad or interurban railroad, where such street or highway crosses such track or tracks at grade, and where the view of the said crossing is obscured, either wholly or partially, shall before attempting to make the said crossing, and at some point not nearer than

thirty feet of the said track, reduce the speed of his motor vehicle or motorcycle to a speed not to exceed six miles per hour before making the said crossing, unless there are flagmen or gates at such crossing and such flagmen or gates show that the way is clear and safe to cross such track or tracks, and provided further that the provision of this section shall not apply to persons crossing interurban or street railway tracks within the limits of incorporated cities or towns within the state."

[3] The violation of that statute was specially pleaded, and the burden was upon defendant to show such violation by a preponderance of the evidence. Mr. Johnson was on the front seat of the car, to the right of Mr. Simmons, which was the side from which the train approached. Mrs. Simmons owned the automobile, which was a two-seated Ford car, with a capacity of five passengers. The automobile was nearly new, and equipped with the usual appliances for controlling its movements and stopping it, all of which were in good condition. Mrs. Brewer, Mrs. Johnson, and Mrs. Brewer's little daughter were on the rear seat, and Mrs. Johnson was on the left or south end of the seat. The automobile had a top, but there was no obstruction of the view on either side.

Plaintiff further testified:

"I don't remember that I heard any one suggest to the driver or any one else in the car to look up north or south and see if a train was coming from either direction; don't remember anything about that. If anything like that had been said before this blank came to my memory, I would remember it. I don't know whether anything was said like that or not, but I believe if there was anything said I would have heard it. My hearing was good. I was well acquainted with all the people in the car; they were all my relatives, and we were on good terms, of course. They were all well and sound and had good hearing. All of them had good eyesight. My eyesight is pretty good. I wear glasses, but my vision was all right. I had my glasses on that day, as we were driving along there. If I or any of the people in the car, as that car approached the railroad track, and before we got up close enough to the track to be struck by a passing train, had said to Mr. Simmons, 'You better stop and let a train pass, better stop or check up and look for a train,' I suppose he would have done so. If it had occurred to me to suggest to him that he stop, check up, or listen and avoid any danger of a collision with a train, knowing him as I did, I wouldn't have had any hesitancy in making that suggestion or cautioning him; I would have felt free to make the suggestion. I suppose all the rest of them in the car would have felt the same way about that. * * *

"The people who were riding in the car that day weren't paying Mr. Simmons anything for that privilege. We were all in the car together, and going to Ft. Worth for the joint benefit of all. * * *

"The car we were riding in belonged to Mr. Simmons. As to the occasion of my husband and I going in the car to Ft. Worth on that date, my brother-in-law was taking my sister home, that had been up with his wife, and we went on business, too, me and my husband—we went with them in the car. We had some business to transact at Ft. Worth. Mrs. Brewer lived here in Ft. Worth. Mr. Simmons didn't have any business to transact here, too—he just came to bring my sister home. Mr. Simmons wasn't interested in the business that my husband and I had to transact here. Mrs. Simmons had been in childbirth, and her sister had been up there with her."

Many authorities are cited to support appellant's contention that Simmons, the driver of the car, in failing to stop, look, and listen for the approach of the train before he reached the crossing, and also plaintiff and her deceased husband, in failing to have Simmons take that precaution, were all, as a matter of law, guilty of negligence, proximately contributing to cause the accident, and that such negligence on the part of either or all was a bar to plaintiff's recovery. The theory upon which it is contended that the negligence of Simmons, the driver, should be imputed to plaintiff and her husband is the further contention that in making the trip they were engaged in a common enterprise for the benefit of all. Some of those authorities are the following: Ferrell v. Beaumont Traction Co., 207 S. W. 654; St. Louis, B. & M. Ry. Co. v. Paine, 188 S. W. 1033; Missouri, K. & T. Ry. Co. v. Trochta, 181 S. W. 761; Southern Traction Co. v. Kirksey, 181 S. W. 545; Ft. Worth & D. Ry. Co. v. Hart, 178 S. W. 795; Beaumont, S. L. & W. Ry. Co. v. Moy, 174 S. W. 697; International & G. N. Ry. Co. v. Edwards, 100 Tex. 22, 93 S. W. 106; Galveston, H. & S. A. Ry. Co. v. Kutac, 72 Tex. 643, 11 S. W. 127.

In the case of Railway Co. v. Kutac, cited above, our Supreme Court used the following language:

"Ordinarily the fact that the customary signals were not made does not relieve a person approaching an open crossing from the duty of keeping a proper lookout on approaching the road. And where a person, knowingly about to cross a railroad track, may have an unobstructed view of the railroad so as to know of the approach of a train a sufficient time to clearly avoid any injury, he cannot recover as a matter of law, although the company may have been negligent or neglected to perform a statutory requirement."

That announcement fairly reflects what has been decided in many decisions of the courts of last resort of this state.

[4] It is well settled that the negligence of the driver of a private vehicle is not ordinarily chargeable to other occupants of the vehicle who are riding at the invitation or with the consent of the driver. Galveston, H. & S. A. Ry. Co. v. Kutac, supra; Lyon v. Phillips, 196 S. W. 995.

[5] And the testimony of plaintiff, quoted above, fails to support appellant's contention

that the making of the trip in question was such a joint undertaking on the part of plaintiff and her husband with Simmons, the driver, as to make the latter their agent, and thus take the case out of the operation of that general rule.

[6] Her statement that they were "going to Ft. Worth for the joint benefit of all" was but a conclusion, and the facts subsequently detailed by her as the basis of that conclusion clearly brings the case within the operation of the general rule last referred to and announced in the two decisions last cited. And no testimony of any other witnesses was introduced of a contrary effect.

[7] Nor can we say that as a question of law the evidence conclusively shows that either the plaintiff or her husband was guilty of contributory negligence precluding recovery in failing to have Simmons, the driver, either stop the car before reaching the crossing, or so slacken its speed as to avoid the collision. That was a defensive issue, and the burden was on the appellant to establish it by proof. Plaintiff, the only surviving occupant of the car, could remember nothing immediately preceding the accident, and, accordingly, there was no testimony of any witness that any of those occupants other than Simmons discovered the approach of the train in time to warn the driver of the impending danger. We think the evidence tends to show that plaintiff and her husband relied upon the driver to operate the car in a careful manner, and to take the necessary precautions to avoid accidents; it being a matter of common knowledge that guests in such cars usually so act. There was no testimony showing that Simmons was a reckless driver, and we cannot say as a matter of law that either plaintiff or her husband was guilty of negligence in relying upon him to keep a proper lookout for a train at the crossing.

Accordingly, even though it could be said, which it is unnecessary in this case to decide, that aside from the question whether or not Simmons violated the requirements of the statute quoted above, he was, as a conclusion of law, guilty of contributory negligence in failing to discover the approach of the train, and after such discovery to stop or so slacken the speed of his car as to avoid the collision, yet we cannot reach that conclusion as to either plaintiff or her husband. Texarkana & Ft. S. Ry. Co. v. Rea, 180 S. W. 945; Hovey v. Sanders, 174 S. W. 1025, in which writ of error was refused, and authorities there cited.

[8] Plaintiff's husband was 29 years of age, in good health, strong, and a diligent, hardworking farmer. He had been married to plaintiff less than one year, and was cultivating 90 acres of land as a share cropper at the time of his death. And although he had previously for about 5 years worked as a hired hand for a salary of only $20 to $30 per month,

we are unable to say that the final judgment in plaintiff's favor for $12,000 damages is so excessive as to require a reversal, as insisted by appellant. Missouri Pac. Ry. Co. v. Lehmberg, 75 Tex. 61, 12 S. W. 838; International & G. N. Ry. Co. v. McVey, 81 S. W. 991; Texas & P. Ry. v. Howard, 200 S. W. 1159; San Antonio & A. P. Ry. Co. v. Harding, 11 Tex. Civ. App. 497, 33 S. W. 373.

For the reasons indicated, all assignments of error are overruled, and the judgment is affirmed.

## On Motion for Rehearing.

[9] As shown in our original opinion, the jury by their verdict assessed plaintiff's damages for the loss of her husband in the sum of $30,000, of which amount $18,000 was found by the trial judge to be excessive, and a remittitur of that amount was filed by plaintiff in the trial court. The award of damages so excessive cannot reasonably be explained upon any other hypothesis than that of bias in the minds of the jury in favor of the plaintiff. The rule is well settled that in cases of this character improper argument by counsel for plaintiff, calculated to appeal to the sympathy or prejudice of the jury, will furnish a valid reason for the reversal of a judgment in behalf of plaintiff. Kansas City, M. & O. Ry. Co. v. Cave, 174 S. W. 872, and decisions there cited; Gordon Jones Construction Co. v. Lopez, 172 S. W. 987, and decisions there cited; Chicago, R. I. & T. Ry. Co. v. Musick, 76 S. W. 219. The principle controlling in such cases applies with special force in the present suit, in which bias in the minds of the jury is so strongly shown.

As appears in our opinion on original hearing, the testimony introduced tended strongly to support the defense of contributory negligence on the part of plaintiff's deceased husband, and almost conclusively and as a matter of law, established contributory negligence on the part of Simmons, the driver of the automobile, in failing to observe the approach of the train in time to stop his car before reaching the crossing. Notwithstanding that evidence, the jury, in answer to special issues, found that neither Simmons nor plaintiff's deceased husband was guilty of contributory negligence in those respects.

Under such circumstances, it is reasonably probable that bias in the minds of the jury in plaintiff's favor in assessing damages in such an excessive amount influenced them also in their finding in plaintiff's favor against the defense of contributory negligence on the part of her husband; and for that reason we have reached the conclusion that the motion for rehearing should be granted, the judgment of the trial court should be reversed, and the cause remanded for another trial; and it is accordingly so ordered.