### ST. LOUIS, S. F. & T. RY. CO. et al. v. MORGAN et al. (No. 295–3567.)*

(Commission of Appeals of Texas, Section B. April 5, 1922.)

1. **Railroads** ⟺350(30)—**Automobile driver's contributory negligence in attempting to cross track held for jury.**

Whether automobile driver, who saw approaching train when train at the shortest possible distance under the evidence was 167 yards from the nearest edge of the crossing and when automobile was only 8 feet distant from the track, was negligent in attempting to cross in front of train, *held* for the jury, in view of evidence, from which it could be inferred that he would have successfully crossed the track if engine had not been killed because of defects in crossing.

2. **Railroads** ⟺348(1)—**Finding of defective crossing sustained.**

In an action for death of an automobile driver at a crossing, evidence *held* to sustain finding that railroad did not maintain a proper, suitable, and safe crossing at the point where the accident took place.

3. **Appeal and error** ⟺1001(1)—**Verdict on issue raised by evidence is final.**

Where there was evidence sufficient for the submission of an issue to the jury, its decision thereon is final.

Error to Court of Civil Appeals of Fifth Supreme Judicial District.

Action by Lea Morgan and another against the St. Louis, S. F. & T. Ry. Company and another. Judgment for plaintiffs affirmed by the Court of Civil Appeals (220 S. W. 281) and defendants bring error. Affirmed.

J. L. Lockett, Jr., of Fort Worth, and Edgar Wright, of Paris, for plaintiffs in error.

Newman Phillips, of Cooper, and Clark & Sweeton, of Greenville, for defendants in error.

HAMILTON, J. Lea Morgan, for herself and, as next friend, for her minor daughter, Tommie Lee Morgan, sued the Gulf, Colorado & Santa Fé Railway Company and the St. Louis, San Francisco & Texas Railway Company, corporations, for damages for alleged negligence resulting in the death of T.

L. Morgan, husband and father of Lea and Tommie Lee Morgan, respectively.

Pecan Gap, at the time of the accident, was a town of about 800 inhabitants. Defendants' railroad ran east and west through the southern part of the town extending west in a straight line from the point of the accident 2 or 3 miles at least. There were three parallel tracks on the crossing where Morgan was killed; a switch track on each side, and a main track between. The north track was called "house track," the south track was called the "switch track," and the middle was called "main line track." The distance between the "switch track" and the "main line track" was 6 or 8 feet, and the distance between the "main line track" and the "house track" was 35 feet. One coming into the main street from the south would cross the "switch track" first and then the "main line track."

The main street of the town ran north and south. At the south end of this street and at or near the "house track," the street converged into and became a public road which extended on south across the three tracks and, at a distance of 15 or 30 feet south of the "switch track," turned to the left and continued east parallel with the railroad about 300 yards into a road running north and south parallel with main street above mentioned.

Along this public road paralleling the railroad, traveling west in a Ford car, after 11 o'clock, May 19, 1917, came T. L. Morgan. At the same time, from the west, on the main line of the railroad, came the "Texan," a "through" passenger train of seven cars besides the tender and engine, at not less than 40 miles an hour. The engine was equipped with an electric headlight of 2,000 candle power. There was nothing on the railroad to obstruct the view of this train from Morgan, except a line of telegraph poles on the south side of the railroad. He turned to the right to cross the railroad into main street, and the locomotive struck his car, demolishing it, throwing the broken and twisted parts off the track, and injuring Morgan internally so that he died about three hours afterwards. The train was due at Pecan Gap at 11:37 p. m. and arrived there at 11:42 p. m.—five minutes late.

Plaintiff pleaded discovered peril, negligence of defendants in operating and running the train at a "high and dangerous and reckless speed," negligence in failing to blow the whistle and ring the bell before reaching the crossing, and negligence of the defendants in failing "to make and maintain a proper, suitable, and safe crossing of said public road and the approaches to said railway track," as proximate causes of Morgan's death.

---

⟺For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

*Rehearing denied May 17, 1922.

The trial court, after submitting to the jury appropriate principles of law applicable to the questions of fact arising from the issues made by the evidence, submitted to it those questions. The questions submitted, excepting No. 7 relating to the amount of damages, and the jury's answers thereto, follow:

"Question No. 1.

"(a) Did or not defendants, or either of them, maintain a proper, suitable, and safe crossing at the point where said defendants' railroad crosses what is commonly known as the Cooper and Pecan Gap road where it enters the town of Pecan Gap from the south? Answer (a): 'No.'

"(c) If, in answer to the foregoing question, you have said that the said road crossing was in an unsafe condition, then state whether or not the same caused deceased T. L. Morgan's car to jolt and slacken its speed or to stop, and whether thereby causing T. L. Morgan and his car to be struck by defendants' train? Answer (c): 'Yes.'

"(d) In answering (a) and (c), if you have found that the crossing was unsafe, and if you have found that on account thereof that deceased's car was caused to slacken or stop, or if you have found that on account thereof he and his car was struck, then was or not defendants' agents and servants negligent in not keeping same in safe condition, as the term 'negligence' is defined in paragraph 1 hereof? Answer (d): 'Yes.'

"(e) If you answer the above questions Nos. (c) and (d) in the affirmative, then was or not the negligence of defendants' servants the proximate cause of deceased's being struck? Answer (e): 'Yes.'

"Question No. 2.

"(a) Did or not defendants' employees and servants in charge of its engine blow the whistle and ring the bell at least 80 rods before reaching said crossing, and ring the bell continuously until the crossing was passed? Answer (a): 'No.'

"(b) If you find they did not, then was or not their failure to do so the proximate cause of deceased, T. L. Morgan, and his car being struck? Answer (b): 'Yes.'

"Question No. 3.

"(a) Were or not defendants' employees and servants in charge of its engine, at the time and place in question, running said train at an unusual and dangerous rate of speed? Answer (a): 'Yes.'

"(b) If so, were they guilty of 'negligence' as that term is defined in paragraph 1 hereof? Answer (b): 'Yes.'

"(c) If you have answered (a) and (b) in the affirmative, then was their negligence the proximate cause of deceased, T. L. Morgan, and his car being struck? Answer (c): 'Yes.'

"Question No. 4.

"(a) Did or not defendants' employees and servants in charge of its engine see the deceased, T. L. Morgan, or his car in a dangerous and perilous position in time to have avoided striking him by the use of every means at hand consistent with the safety of the train and its occupants? Answer (a): 'No.'

"(b) If so, were they guilty of negligence, as 'negligence' is defined, in not handling their train so as to avoid striking him? Answer (b): 'No.'

"(c) Was their negligence, if any, the proximate cause of deceased, T. L. Morgan, and his car being struck? Answer (c): 'No.'

"Question No. 5.

"(a) Was deceased, T. L. Morgan, at the time in question, under the influence of intoxicants? Answer (a): 'No.'

"(b) If so, did that cause or contribute to cause him to be struck by defendants' train? Answer (b): 'No.'

"Question No. 6.

"(a) Was deceased, T. L. Morgan, reckless or careless in driving onto the railroad crossing at the time and place? Answer (a): 'No.'

"(b) Did he fail to exercise ordinary care to ascertain if defendants' train was approaching said crossing at the time he approached and undertook to cross the same? Answer (b): 'No.'

"(c) If you answer (a) and (b) in the affirmative, then was his negligence, if any, the proximate cause of him and his car being struck? Answer (c): 'No.'"

Upon the findings of fact above shown, the court entered judgment, January 7, 1919, for plaintiffs in the sums for which the jury found each had sustained damage—$10,250 for Lea Morgan and $5,250 for Tommie Lee Morgan.

Defendants gave notice of appeal, but failed to perfect it, and sued out a writ of error to the Court of Civil Appeals, which affirmed the judgment of the trial court.

They then sought, and the Supreme Court granted, a writ of error.

[1] Plaintiffs in error, among other complaints, insist that Morgan was guilty of contributory negligence as a matter of law.

[2] The evidence overwhelmingly sustains the finding of the jury that the defendants did not maintain a proper, suitable, and safe crossing at the point where Morgan was killed. Extracts from the statement of facts are:

"As to the condition of that crossing, it seemed like the plank got a little too low down for the railing, and the wind blowing whipped out and the dirt and one thing another, and the plank seemed to get a little too low and a little too wide apart, and in riding in an auto if you wasn't going a pretty good gait making that turn it was pretty hard to cross it; of course, if you was running pretty swift gait you were liable to go right on there, but if not you were liable to stop right on that track. * * * As to how I know at the time I am testifying about that this track was in the condition I say it is, just a little while after Mr. Morgan was killed I was at town and started home and when I got to that track an automobile come running up there and it run up there and the wheels dropped off in there and the engine went dead; that was just a few days after Mr. Morgan was killed. * * * There is an elevation up to the track and making a curve around going up this way the dirt road come around and went up on the track; there was right smart elevation right at the track, and then the rail was some three or four inches higher than the dirt on the

outside and it was low between the rails. As you approached the track from the outside, it was something like three inches, I will say, below the rail, and then you .go over the rail and then down again between the rail; the fall was also between the rails. * * * At that time the condition between the main and the switch track was bad because jumping over those rails from both ways and hitting those rails it had eat that ground out in chug holes and it was bad to get over it. From the bottom of some of those chug holes to the top of the rails was eight and ten inches, but that was between the switch and the main line was those deepest holes I am speaking about."

As to the behavior of a Ford car it was proved:

"If you throw your car in low gear and go over a rough place and it ·is very rough and your foot jolts off that clutch, it will go in high itself and kill your engine and your car might glide six or eight or ten feet on. If you release your clutch, if your foot is thrown off your clutch, it will come plumb back in high, unless you have your emergency brake pulled up, and if it is pulled up in neutral your car is not going to move; that is why, when you pull your emergency brake up in neutral, you can crank it without it running off. In driving a Ford car to go down in a chug hole like I was describing on this crossing, it will kill your engine unless you be very careful and hold your foot on low and let it pull on through; it will pull on through in low, you know; it has got more power when it is on low—it will pull on through it."

The plaintiffs' theory of the case was that Morgan would have crossed the track before the train reached the crossing but for the condition of the crossing; that the engine of his car was "killed" by the rough condition there existing, and consequently the car stopped on the track; and that he had plenty of time to get across had the engine not been "killed."

As to the distance from the train to the crossing when Morgan reached it, two witnesses testified. Myrtle Dobbins saw, from the gallery of the section house, both the train and the automobile just before the accident. The section house was near the railroad track. From the edge of the crossing at which Morgan was struck, along the .railroad to a point on it opposite the steps of the section house, the distance was 167 yards. Miss Dobbins testified:

"I saw the automobile crossing the first track. * * * I had not seen the automobile further down the road. I saw it right at that time. The lights on the automobile were not burning when I turned and saw the train. * * * I wasn't noticing the train at the time I noticed the automobile and, when the lights went out, I turned and saw the train was passing, and I turned and watched the train. * * * I saw the car, and the lights went out before I saw the train. When the lights went out, the automobile was on the first track; I could tell, and I am certain of that."

239 S.W.—39

S. Coleman, engineer on the train, testified:

"Yes, when I got within about a mile of that crossing I saw some lights down there somewhere near that crossing. I didn't see them but a little while. I knew there was a party crossing there. Yes, that was one of the public crossings I made on my run at that time. My first idea, when I saw those lights, was that it was a headlight; the lights were so bright. But a second or two later I could see it was an automobile. Yes, I knew the car was traveling in my direction. I don't know whether the idea passed through my head that he would use that crossing or not. In a short time after that the lights went out. At the time the lights went out I was something near between three-quarters of a mile and a mile .from the crossing. The way I was running it took close to a minute to run that distance, saying it was three-quarters of a mile away."

We think this evidence is sufficient to justify the jury in believing that when Morgan reached the switch track the train was "something near between three-quarters of a mile from the crossing." If the jury believed Miss Dobbins' testimony, rather than ,Coleman's, it was such as to justify a belief that the train was not nearer than 167 yards to the crossing when Morgan had gotten on the first, or "switch," track. This track was 8 feet from the main line. The question then is: Was Morgan guilty of contributory negligence barring a recovery in trying to cross the main line· 8 feet distant when the train was, at the shortest possible distance, under the evidence, 167 yards or 501 feet away .from the nearest edge of the crossing? We do not think so.

If Morgan made the attempt to cross with full knowledge of the approach of the train and of the condition of the crossing, we think it a question for the jury to determine whether such attempt, under the circumstances, when the train was that far away, was negligence. We cannot say that, under the state of facts existing in this case, reasonable men may not fairly differ upon the question as to whether Morgan was negligent or not in attempting to cross. It is apparent that he would have crossed the main line in absolute safety had his car not stopped. There · is no evidence that it stopped for any other resaon than that the engine was killed by the rough and unsafe condition of the crossing. It is urged that Morgan knew the condition of the crossing, and it is shown by the record that he had crossed it several times every day previous to the time he was killed, and it is reasonable to infer that he was familiar with its condition. But it is nowhere shown that his engine had ever been "killed" while crossing there, nor is it shown that he knew that any other person's engine had ever been "killed" while crossing at that place. The fact that he knew the condition of the crossing was

not sufficient to charge him with negligence in attempting to cross, on the ground that his engine might be "killed" and his car thereby caused to stop on the track in front of the train, when it had never before been "killed" though he crossed there several times every day. The fact that he had crossed there so often was rather an assurance than a deterrent to his last and fatal attempt.

Plaintiffs in error insist this case is governed by the principles announced in the cases of I. & G. N. Ry. Co. v. Edwards, 100 Tex. 22, 93 S. W. 106, and T. & N. O. Ry. Co. v. McDonald, 99 Tex. 207, 88 S. W. 201. There is in fact no similarity between the instant case and either of those cases. Merely to state them is clearly to distinguish each of them from the instant case. In the Edwards Case:

"The evidence, without contradiction, shows that the plaintiff walked along the road at night, approaching the railroad obliquely, with his side towards it, until he came near the crossing when he turned with the road across the track, and was struck as he reached the center thereof. The train was visible by its electric headlight upon a straight track for a mile or more before it reached the crossing and the noise of its motion was plainly audible. Plaintiff admits that, before stepping on the track, he neither looked nor listened for the train, although he was familiar with the crossing and knew of the frequent passing of trains, and that he could have seen and heard it, had he done so. All of the other evidence is to the same effect. He relies alone upon the fact, which the evidence is sufficient to prove, that the whistle was not blown nor the bell rung as required by the statute, claiming that he was listening for those signals, and, because he did not hear them, did not look for the train nor pay any attention to the noise it made."

If, due to a defect in the crossing, plaintiff in the Edwards Case had fallen down, and, before he was able to get up and off the track, the train had struck him, the case would have been analogous to the one in hand. In that event, we surmise a different judgment would have been rendered by the Supreme Court.

In the McDonald Case the plaintiff sat on a tie eating his lunch under a car standing on the track. The car was set in motion by an engine switching other cars, and the shoe of the brake on the sheltering car struck the plaintiff, knocked him over, and the wheels cut off both his legs. In order to have had a real analogy between that case and the one under consideration, Morgan would have had to run his car upon the main line of defendants' road, stop voluntarily, and with no fault of the defendants, and sit there till the train knocked him off.

[3] The question of Morgan's negligence was one for the jury. The jury has decided it adversely to the defendants, and that decision is final.

We have carefully considered all other assignments of error and think the Court of Civil Appeals correctly disposed of the questions presented in each of them.

Therefore we recommend that the judgment of the Court of Civil Appeals be affirmed.

CURETON, C. J. The judgment recommended in the report of the Commission of Appeals is adopted and will be entered as the judgment of the Supreme Court.

PIERSON, J., not sitting.