CHICAGO, R. I. & G. RY. CO. v. STEELE.*
(No. 10658.)

(Court of Civil Appeals of Texas. Fort Worth. April 26, 1924. Rehearing Denied June 7, 1924.)

1. **Railroads ⚹350(11)—Negligence at crossing held for jury.**

Whether train operatives exercised due care for protection of persons at highway crossing *held* for jury, on plaintiff's evidence as to rate of speed, obstruction of view from crossing, and failure to sound signals.

2. **Railroads ⚹350(7)—Giving of signals held for jury.**

Whether whistle was blown or bell rung by train operatives, on approaching crossing at which automobile was struck, *held* for jury.

3. **Evidence ⚹471(10) — Witness' testimony that he would have heard bell if rung as train approached crossing held admissible.**

Witness' testimony that he would have heard bell, had it been rung by train operatives on approaching crossing, *held* admissible on issue whether he and other occupants of automobile struck by train had looked, listened, and heard nothing; objection that it was conclusion going to weight rather than admissibility.

4. **Appeal and error ⚹1050(1)—Witness' testimony that he would have heard bell, if rung as train approached crossing, held not materially prejudicial.**

In action for injuries to occupant of automobile struck by train at crossing, another occupant's testimony that he would have heard bell, had it been rung, *held* not materially prejudicial to defendant, in absence of evidence that witness had defective hearing, or was in no position to hear, in view of his previous testimony that he did not hear bell or whistle.

5. **Railroads ⚹312(13) — Running train at high speed without signals held negligence.**

Running train at 60 miles an hour, without signals, over crossing from which view was obstructed by cut, embankment, weeds, and tall grass, *held* negligence proximately causing injuries to occupant of automobile struck at crossing.

6. **Railroads ⚹350(22)—Contributory negligence of occupants of automobile held for jury.**

Whether driver and occupants of automobile struck by train traveling down grade 60 miles an hour, without signals, toward crossing from which view was obstructed by cut 14 feet deep, curve in track, weeds, etc., were guilty of negligence proximately resulting in injuries, *held* for jury.

7. **Railroads ⚹346(5)—Burden on defense to prove contributory negligence.**

In action for injuries to occupant of automobile struck by train at crossing, burden was on defendant to establish contributory negligence of driver and occupants of car, as alleged by it.

8. **Railroads ⚹348(6) — Finding on issue of contributory negligence held supported by evidence.**

Jury's findings that driver and occupants of automobile, struck by train at crossing, were not guilty of contributory negligence proximately resulting in injuries, *held* sufficiently supported by testimony of driver and occupant, whose credibility was not attacked.

9. **Trial ⚹260(8)—Refusal of special charges held not error, in view of general charge and special charges given.**

Defendant's requested special charges on contributory negligence *held* properly refused, as unduly emphasizing such issue, in view of other special charges given at its request, though more general, and court's general charge.

10. **Appeal and error ⚹882(8)—Admission of testimony as to others' failure to discover trains approaching crossing, until very close held not reversible error.**

In action for injuries to occupant of automobile, struck by train traveling at high speed, without signals, at crossing from which view was obstructed, admission of plaintiff's witnesses' testimony as to narrow escapes by them, on former occasions, from being struck at such crossing by trains, which they did not discover until very close, *held* not reversible error, in view of defendant's evidence and attempt to show, by cross-examination of plaintiff's witnesses, that one approaching crossing could see and hear approach of train in time to cross or stop before its passage.

11. **Appeal and error ⚹1062(5)— Judgment not in conflict with findings on material issues not affected by submission of, and findings on, immaterial issues.**

Submission of immaterial issues, and special findings thereon, cannot affect disposition of case, where judgment is not in conflict with findings on material issues.

12. **Appeal and error ⚹1051(3)—Engineer's testimony that he regarded crossing as dangerous held harmless, in view of admitted fact.**

In action for injuries to occupant of automobile struck by train traveling at high speed, without signals, at admittedly dangerous crossing, engineer's testimony that he regarded crossing as dangerous *held* harmless.

13. **Railroads ⚹347(9)—Testimony engineer regarded crossing as dangerous held relevant.**

Engineer's testimony that he regarded crossing as dangerous *held* relevant to issue of negligence in approaching it at high speed without statutory signals.

---

⚹For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes
*Writ of error dismissed for want of jurisdiction November 19, 1924.

14. Appeal and error ⊜➾1056(4)—Issue whether occupants of automobile, struck by train at crossing, were engaged in joint enterprise held immaterial.

Exclusion of testimony of owner of automobile, struck by train at crossing, that he was running car for hire, and had collected money from occupants for such trip *held* not error; issue as to whether they were engaged in joint enterprise, so as to render each responsible for driver's negligence being immaterial, in view of jury's finding, on sufficient evidence, that neither driver nor occupant suing for injuries was contributorily negligent.

15. Railroads ⊜➾347(7, 10)—Evidence of failure to maintain crossing held relevant on issues of negligence.

Evidence as to railroad's negligent failure to keep highway crossing in proper condition, as required by Rev. St. art. 6494, *held* relevant to issues of negligence of train operatives in approaching crossing, and contributory negligence of driver and occupants of car struck thereat, though railroads are given right to construct roads across public highways by article 6485.

16. Appeal and error ⊜➾1062(1)—Submission of issue whether defective condition of railroad crossing was proximate cause of accident held immaterial.

That court required finding as to whether defective condition of railroad crossing was proximate cause of accident, *held* immaterial, in view of finding that negligence of train operatives in approaching crossing was proximate cause.

17. Appeal and error ⊜➾1062(1)—Submission of discovered peril held immaterial, in view of findings on other material issues.

Submission of issue of discovered peril, in action for injuries to occupants of automobile struck by train at crossing, *held* immaterial, in view of issues on which judgment might be supported.

18. Railroads ⊜➾347(10, 11)—Evidence of obstruction of view held relevant to issues of negligence and contributory negligence.

In action for injuries to occupant of automobile struck by train at crossing, evidence that view of train was obstructed by weeds and grass *held* relevant to issues of negligence of trainmen, and of driver and occupants of car.

19. Appeal and error ⊜➾1070(2) — Whether finding that obstruction of view from crossing by weeds and grass was proximate cause of accident was supported by evidence held immaterial.

Whether finding that obstruction of travelers' view of train at crossing by weeds and grass was proximate cause of accident was supported by evidence *held* immaterial, in view of sufficiently supported finding that negligence of train operatives in approaching crossing was proximate cause.

20. Appeal and error ⊜➾1140(1)—Appellate court's power to cut down verdicts confined to cases of prejudice or passion.

Appellate court's power to cut down verdicts is confined to cases where there is some indication of prejudice or passion on part of jury.

21. Damages ⊜➾132(7)—$35,000 for injuries permanently incapacitating 28-year old section hand and foreman held not excessive.

$35,000 for permanent injuries rendering 28-year old man, who had worked as section hand and apprentice section foreman at usual wages, so helpless as to require others to care for him, by reason of failure of broken leg to heal, etc., *held* not excessive.

Appeal from District Court, Wise County; F. O. McKinsey, Judge.

Action by J. Frank Steele against the Chicago, Rock Island & Gulf Railway Company. Judgment for plaintiff, and defendant appeals. Affirmed.

Lassiter, Harrison & Pearson, of Fort Worth, and McMurray & Gettys, of Decatur, for appellant.

J. A. Templeton, of Fort Worth, M. W. Burch, of Decatur, and Dee Estes, of Fort Worth, for appellee.

CONNER, C. J. J. Frank Steele instituted this suit, in the district court of Wise county, against the Chicago, Rock Island & Gulf Railway Company to recover damages on account of a collision between one of defendant's passenger trains and an automobile in which the plaintiff, with four companions, was riding, near Chico, Texas, on July 29, 1920.

It was alleged that the defendant was negligent in that the train was running at a rapid rate of speed, and that the statutory signals were not sounded for the public crossing where the accident occurred, and that the plaintiff's view of the approaching train was obstructed with grass which the defendant had allowed to grow and remain on its right of way near the crossing. It was further alleged that the defendant had negligently permitted the public road, over and across its right of way and railway track at the crossing in question, to become and remain out of repair to such an extent as to greatly impair its usefulness as a public highway.

The defendant denied these allegations of negligence, and averred that by the use of any care, whatever, by the plaintiff and the other occupants of the automobile, before coming on the track at the crossing, the approaching train would have been seen and heard, and the collision avoided.

It may be stated, in a general way, that the train approached from the northwest, and that plaintiff and his companions were traveling in the same general direction on a public road running parallel with the east line of defendant's right of way until it made a sudden turn to the right, where it entered upon the right of way and extended on in a westerly direction, crossing the railway track

⊜➾For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

at a right angle. At a point several hundred feet north of the crossing, a cut began which was about 14 feet deep, 1,000 feet from the crossing, and about 5 feet deep, 200 feet north of the crossing. There was considerable evidence tending to show that the right of way was incumbered by grass and weeds, north of the crossing, which would tend to obstruct the view of persons approaching the crossing, as the plaintiff was at the time of the accident. There was evidence tending to show that the crossing was 14 feet lower than a point on the track, 1,400 feet north of the crossing, and that there was a slight curve 75 or 100 feet north of the crossing, and that the speed of the train, at the time, was variously estimated at 45 to 60 miles per hour. The evidence in behalf of the plaintiff also tended to show that in the public road, some 15 or 20 feet east of the crossing a mudhole had been formed by a drain on the right of way from the north, which had been partially filled with rocks, and that, as the plaintiff and others entered upon the right of way, the speed of the automobile had been lessened to about 3 miles an hour, and that the approaching train was not discovered until within a few feet of the track, when it was too late to stop and avoid the collision, whereupon the driver attempted to cross, with the result that the train collided with the back end of the car, killing two of the occupants, and very seriously injuring the plaintiff.

The case was submitted upon special issues, which, together with the answers of the jury, are as follows:

"(1) Did the defendant, at the time of the accident, keep and maintain the crossing in question, including the approach thereto on its right of way, in a reasonably safe condition for use by the public? Ans. No.

"(2) If you answer the above issue in the affirmative, then you need not answer this issue No. 2; but if you answer No. 1 in the negative, then, was the defendant guilty of negligence in failing to keep said crossing and approach in a reasonably safe condition for the use by the public? Ans. Yes.

"(3) If you have answered issue No. 1 in the negative and issue No. 2 in the affirmative, then was such negligence of the defendant, if any, a proximate cause of the accident, and of the injury to the plaintiff? Ans. Yes.

"(4) Did the defendant permit weeds and grass to grow on its right of way, and a dump or embankment to be and remain on its right of way, along its track in such a manner as to obstruct to plaintiff and those with him in the car, as they approached the crossing in question, their view of the train as it approached said crossing from the north, on the occasion in question? Ans. Yes.

"(5) If you have answered the above question in the affirmative, then was it negligence on the part of the defendant to permit said condition, as to weeds and grass and embankment, to exist at that time and place? Ans. Yes.

"(6) If you answer the above question No. 5 in the affirmative, then was such negligence on the part of the defendant a proximate cause of the accident in question, and of the resulting injury to the plaintiff? Ans. Yes.

"(7) Did the defendant's employees, who were operating the train in question, exercise ordinary care, as said train approached the crossing where the accident occurred, to keep a lookout for persons who might reasonably be expected to be traveling on the public highway, and approaching said crossing, to discover them in time to avoid injuring them? Ans. No.

"(8) If you answer issue No. 7 in the negative, then was such failure to exercise such ordinary care a proximate cause of plaintiff's injury? Ans. Yes.

"(9) Did the defendant's employees, who were operating the train in question, cause the whistle on said train to blow at least 80 rods (1,320 feet) before reaching the crossing in question? Ans. No.

"(10) If you answer No. 9 in the negative, then was such failure to blow such whistle a proximate cause of plaintiff's injuries? Ans. Yes.

"(11) Did said employees cause the bell on said train to ring at least 80 rods before reaching said crossing, and to keep ringing until said train had passed over said crossing? Ans. No.

"(12) If you answer No. 11 in the negative, then was the failure to ring said bell, and keep it ringing until the train had passed the crossing, a proximate cause of plaintiff being struck and injured? Ans. Yes.

"(13) Was the headlight, on the locomotive in question, burning as it approached said crossing? Ans. Yes.

"(14) If you answer above issue 13 in the negative, then were the persons operating said train guilty of negligence in failing to have said headlight burning? Ans. (No answer.)

"(15) If you answer No. 13 in the negative, and No. 14 in the affirmative, then was such negligence a proximate cause of the accident and the plaintiff's injuries? Ans. (No answer.)

"(16) Were the persons who were in charge of and operating the train in question running the same at a high and dangerous rate of speed, as it approached the crossing in question, taking into consideration the crossing, and the conditions surrounding the same at that time? Ans. Yes.

"(17) If you have answered the above issue in the affirmative, then was it negligence on their part to run said train, as it approached the crossing in question, at the rate of speed they were running same, and under the conditions surrounding said crossing at the time? Ans. Yes.

"(18) If you have answered the last two issues above in the affirmative, then was such negligence a proximate cause of the accident, and of the resulting injuries to plaintiff? Ans. Yes.

"(19) Did the defendant's employees, who were in charge of the movement of said train as it approached said crossing, discover that the car in which plaintiff was riding would go, or was going, upon the track in front of said train, and would be struck thereby, in time for said employees to have stopped or checked said train, and thus to avoid injuring plaintiff by the use of all the means in their power to avoid the accident? Ans. Yes.

"(20) Did Blocker, the driver of the car in

which plaintiff was riding, look and listen for any approaching train as he approached said crossing, and before he did discover the train? Ans. Yes.

"(21) If you answer No. 20 in the negative, then was it negligence on Blocker's part not to look and listen for a train as he approached the track? Ans. No.

"(22) If you have answered No. 20 in the negative, and No. 21 in the affirmative, then was such negligence a proximate cause contributing to the accident? Ans. (No answer.)

"(23) Was said Blocker guilty of negligence in either of the following respects: (a) In failing to discover the approach of the train in time to stop the car and avoid the accident? Ans. No.

"(b) In attempting to cross the track, in front of the train, after he had discovered its approach? Ans. No.

"(24a) Was the plaintiff guilty of negligence in failing to discover said train in time to have the car stopped, and thus to avoid the injury? Ans. No.

"(24b) In failing to have the driver of the car to stop the same so as to look for the approach of a train, and thus avoid being injured? Ans. No.

"(25) If you have found and answered that the plaintiff was guilty of negligence in either of the matters above inquired about, then was such negligence on the part of plaintiff a proximate cause contributing to his injuries? Ans. No.

"(26) What amount of money do you find from the evidence, if paid now in cash, would fairly and reasonably compensate for the injuries received by him on the occasion in question? Ans. $35,000.00."

Appellant has presented numerous assignments of error, but we will address ourselves first to a discussion of the questions presented in issues Nos. 16, 17, and 18, to which the jury answered, in effect, that the persons in charge of and operating the train in question were running the same at a high and dangerous rate of speed, as it approached the crossing, taking into consideration the crossing and conditions surrounding the same at the time, and that such action on their part constituted negligence, which was the proximate cause of the accident, resulting in the injuries to the plaintiff.

Second, the questions presented in issues Nos. 20, 21, 22, 23, 24a, and 24b were answered by the jury to the effect that neither Blocker, the driver of the car, nor the plaintiff was guilty of any contributory negligence.

[1] The evidence was more or less conflicting on the issues thus presented, but the evidence in behalf of the plaintiff undoubtedly was sufficient to support the finding of the jury that the operatives of the engine operated the train in question at a dangerous rate of speed, as it approached the crossing. The plaintiff's evidence tended to show that, in approaching the crossing, the view to the north was obstructed by the cut referred to, and the embankment made by the deposit from the cut, as well as by weeds and tall grass extending from the roadbed on the east side of the road. Some of the witnesses estimated this grass to be as high as 7 feet, and a sample thereof has been sent to this court, by order of the court below, and the sample so exhibited fully bears out the statement of the witnesses in this respect. There was evidence further tending to show that the operatives of the train were well acquainted with the crossing in question; that the train at that time was 15 minutes late, and was running 60 miles an hour, and that no whistle was blown or bell rung.

We think it was undoubtedly a question of fact to be submitted to and found by the jury as to whether, under such circumstances, the operatives of the train, for which the defendant railway company is liable, exercised due care for the protection of persons passing over its road. See M., K. & T. Ry. v. Rogers, 91 Tex. 56, 40 S. W. 956, and cases therein cited. Also, C., R. I. & G. Ry. v. Johnson (Tex. Civ. App.) 224 S. W. 277; Galveston H. & S. A. Ry. v. Michalke, 14 Tex. Civ. App. 495, 37 S. W. 480, writ refused; Hines v. Smith (Tex. Civ. App.) 235 S. W. 657.

[2] It is true that, on the issue of whether or not the whistle was blown or bell rung, the evidence was conflicting. The operatives of the train testified that both signals were given, and other witnesses, not shown to be interested, also testified to the effect that the whistle was blown and bell rung. But at least six witnesses, who by their testimony were placed at points where both of these sounds could have been heard, testified that they did not hear any whistle blown or bell rung. One Mr. Campbell, a passenger on the train, testified that he did not hear such signals until after the collision. A Mrs. Woods, who placed herself some 200 or 300 yards from the train, noticed the train going down the grade, but did not hear any bell rung or whistle blown. Lee Barksdale testified that he lived some 450 yards west of the track, and that on the occasion in question he heard no bell or whistle. J. D. McIlheny testified that on the evening in question he was about 300 yards north of the crossing, and that the first thing that attracted his attention was the crash; that he was in swimming at the time, and the first thing he heard after the crash was the whistle; that he did not hear the train going south, nor did he hear any bell rung; that about 15 minutes before the crash he heard a freight train going down, and heard it whistle for Bridgeport.

One of the young men, D. Blocker, who was in the car at the time, testified to the effect that, on top of the hill just before they made the turn to go to the crossing, they looked and listened, but did not see or hear any train, and heard no signals.

Curtis Mosier, another occupant of the car, testified:

"I had not heard any signals of any kind on that train, not until we saw it right on us. * * * I did not hear any bell or whistle.

"Q. If the bell had been ringing or whistle blown, would you, or not, have heard it? A. Yes, we would have heard the bell, if he had rung the bell. It was coming very fast, like a bullet, looked to me like."

[3] Under such circumstances, we think that the question of whether the whistle was blown or bell rung was one of fact for the jury, and that we must accept that fact as found by the jury. C., R. I. & G. v. Johnson (Tex. Civ. App.) 224 S. W. 277. We do not think the conclusion so reached is materially affected by the testimony of the witness Mosier, quoted above, and to which appellant has excepted, on the ground that his statement that he would have heard the bell, had it been rung, was a conclusion. As it seems to us, the objection goes to its weight rather than to its admissibility. He was within a very short distance of the approaching train and, according to his testimony, they had looked and listened and heard nothing; and, while in a sense his answers invoked a conclusion, it seems to be in the nature of a rendition of the conditions and circumstances relevant to that question. In the case of St. L. S. W. Ry. v. Brown (Tex. Civ. App.) 163 S. W. 383, in a section foreman's action for injuries caused by starting a car upon which he was working, without warning, a witness who had worked on the section for 1½ years prior to the injury, and off and on for 32 years in the operative departments, and who was evidently accustomed to heeding railroad signals, and who testified that he was not many cars from the engine, was permitted to testify that he could have heard the whistle of the engine if it had been blown, it was held that this was a statement of a fact rather than an opinion.

In the case of El Paso Electric Ry. Co. v. Boer (Tex. Civ. App.) 108 S. W. 199, in an action for injuries to a plaintiff, in alighting from a street car, a witness testified that plaintiff "was standing talking to us when the car started; just as it started he said, 'Wait,' but the conductor could not hear him, and then he started to get off." It was held that it was error to strike out the words "but the conductor could not hear him," because, from the position of the parties, the witness could tell from observation whether plaintiff was heard by the conductor or not.

[4] No evidence is pointed out to show that the witness Mosier had defective hearing, or was otherwise so circumstanced or conditioned as to have been unable to hear; it is to be remembered, also, that in a previous part of his testimony that we have quoted, the witness had stated that he did not hear either the bell or whistle. So that, on the whole, we think his testimony was not materially prejudicial, in the respect pointed out, and that, together with that of other witnesses testifying on that subject, it sufficiently supports the jury's findings that the customary warnings had not been given.

[5] If the foregoing conclusions are correct, and we think they are, then it is not to be doubted that issues Nos. 17 and 18 were correctly determined by the jury, to the effect that such running of the train, at the time and under the circumstances, without signals constituted negligence that was the proximate cause of the injuries to the plaintiff.

[6] The second vital question is whether Blocker, the driver of the car, or plaintiff was guilty of negligence in any of the particulars specified in issues Nos. 20, 21, 22, 23, 24a, and 24b. The court, in submitting the special issues, began his charge with the usual definitions of "negligence" and ordinary care" and "proximate cause," and instructed the jury to bear them in mind and apply them wherever the terms defined were used in the charge. He further gave, at the request of defendant, the following special charges:

"Special charge No. 16: If you believe from the evidence that on the occasion in question the approach of said train was known to the parties riding in the automobile in time for the automobile to be safely stopped before getting onto such crossing, and the said driver thereof undertook to beat the said train over said crossing, and that such attempt to do so was a want of ordinary care on his part, you are instructed that such attempt on his part would be negligence on his part, and that in that event you will so answer in response to special issue No. 23(b), submitted to you by the court.

"Special charge No. 18: If you believe from the evidence that on the occasion in question the approach of said train was known to the parties riding in the automobile in time for the automobile to be safely stopped before getting onto such crossing, and if you believe from the evidence that plaintiff failed to warn and request such driver to desist or not make such attempt to get over the crossing ahead of the train, and that such failure was a want of ordinary care for his own safety, you are instructed that the plaintiff in that event would be guilty of negligence in failing so to do, and you will answer accordingly in response to defendant's special issue No. 7, submitted to you at its request.

"Special charge No. 19: In connection with all questions submitted to you, in regard to negligence on the part of plaintiff or the driver of the car in which he was riding on the occasion in question, relative to failing to look and listen for an approaching train, or failing to discover its approach in time to stop or cause car to be stopped, and avoid injury, you are instructed that it was the duty of plaintiff, and also of said driver, in approaching said track or crossing to exercise such care for his or their own safety as a person of ordinary care and prudence, with their knowledge of the surrounding conditions and circumstances, would have exercised under these circumstances, and failure to do so constitutes negligence."

Among other things, the witness Blocker testified that about 20 feet from the railway track in the public road, which had long been established, there was a mudhole which had been standing there, and which had been cut up by passing cars and rocks placed in it, which made it "awfully rough"; that in going across that rough place they traveled about 3 miles an hour because of the rough road; that he slowed down to look for the train, and that he had to slow down in order to cross the rough place; that from the mudhole to the rails it inclined upward, and that the rails were about four or five inches off the ground, and that between the rails was dirt which had been washed in, making a rough place to drop into, there being no planks against the rails; that they got within about 3 feet of the crossing before he observed any train; that he looked and listened, on top of the hill, before the turn to the crossing, and looked and listened just before he made the turn to go down to the crossing; that he did not hear or see any train or hear any signals; that a train could not be seen before turning into the crossing because it would be in the cut, and that weeds had grown up there on the side of the dump; that when he got within 12 feet of the track he—

"looked up the track and couldn't see any train, and no sign; did not hear any signal; did not hear any bell ringing or whistle blown. I endeavored to hear a signal before I went in there. I did not see any reflection from any headlight. I looked for one."

He further testified that within 6 or 7 feet of the track on the west was a rough bridge, which had been torn up by a truck. He further testified:

"I got within about three feet of the track and looked up and saw the train, and I was going slow, I threw the car to low, bore down on the gas, and tried to go across. I was driving the car.

"Q. Why didn't you stop and back off? A. It was too late to stop. When I first saw the train up in that cut, it was about 125 feet up the track, I judge. At the time I saw it, the front part of my car was about three feet from the rail.

"Q. Why didn't you press down on the brake and stop it? A. I was going; I couldn't possibly stop. We did not get across. I don't know how far we got before the train came onto us. The train, I think, hit the back end of the car. At that particular time my attention was directed to getting off the track. When the train struck the car it threw us all over the right of way."

This witness further testified that the collision occurred about 7:50 in the evening, when it was just getting good dark; that about "five or six seconds elapsed between the time I first saw that train and the time it first struck our car;" that he was accustomed to driving Ford cars, and knew how they worked and how the machinery was handled, and what had to be done to stop a car, and how to put it in reverse to send it back.

Curtis Mosier testified, among other things, that he was one of the boys riding in the car at the time of the collision, sitting in the front seat on the right-hand side of Blocker, the driver; that Vernon Hanna, Frank Steele, and Bonner Dickenson were sitting in the rear seat; that two of the boys were killed; that the party left the little town of Chico about 7:40 p. m., going to Bridgeport; that within about 20 feet of the track was—

"a muddy place, a chug hole; before we got down that hill to turn to the crossing Blocker and I looked for a train; I could not say about the rest of them, but both of us looked.

"Q. What did you do, looking for a train? A. Well, he looked, and I noticed him looking, and I turned around and looked. I listened for a train, and did not hear nor see anything. After we got down on the level and started toward the track, we looked for a train. About the last time we looked I judge it was about 12 or 15 feet from the track; about 12 feet; something like that. We didn't see nothing; didn't hear no train. At the point where we first looked, and where we last looked, we could not, by looking up there, see up that cut.

"Q. Why couldn't you? A. The embankment there and other things, that you could not; weeds and ties; real high weeds out there. What first attracted my attention to the train, some one in the back seat hollered, I judge it to be the Hanna boy, and just as he did that, I saw it at the same time. It was not very far from us at the time I saw it; I judge about not over 150 feet. At that time the front wheels of our car were in about 2 or 3 feet of the track, the first track. We were running on low gear. I had not heard any signals of any kind on that train, not until we saw it right on us. There was no headlight burning. I looked particularly at that. I did not hear any bell or whistle. * * *

"Q. How near did you come to getting across before the train struck the car? A. I judge 2½ feet; just taken about that much of the car. The rear of the car was struck. I judge it struck the rear wheel. When it struck, that was about all I knowed for quite a bit afterwards. * * *

"Q. How fast was your car traveling when you approached that crossing? A. Well, about 3 or 4 miles, going very slow. The road was very rough, we could not go faster. I know why we were not going faster. It was because that was a railroad crossing, and too rough to drive fast. It was because that was rough ground. The ground was not muddy right at the track, the best I remember, it was not very muddy, but it was awful chuggy, deep chug holes."

While appellant offered photographs of the situation, later taken, and other testimony to the effect that an approaching train could be seen up the cut for at least 20 feet from the crossing, we, nevertheless, think it was for the jury, under all of the circum-

stances, to determine the issue of whether or not the driver and occupants of the car were guilty of negligence in their approach and attempt to cross, which proximately resulted in the injuries shown. It is to be remembered that the train was behind its usual schedule; that the cut was some 14 feet deep, and that the road declined for some 1,400 feet on a 1 per cent. down grade; the witnesses also spoke of a curve in the track, either shortly before or after its entrance in the cut, and it is evident that a train running down grade at 60 miles per hour, without warning signals, gave but little time for observation to those about to cross the track. One witness stated, in substance that an approaching train could not be seen because of the weeds and high grass and dump, further up the track than about 125 feet. At the speed the train was going, this distance would be traveled in about two seconds.

[7, 8] The burden of proof was upon the defendant to establish the contributory negligence alleged by it, and the issue seems to have been fairly submitted by the court and, no discrediting circumstances affecting the credibility of Blocker and Mosier having been pointed out, we feel unable to say that the findings of the jury are unsupported. See, Kirksey v. So. Traction Co., 110 Tex. 190, 217 S. W. 139; Trochta v. M., K. & T. Ry. Co. (Tex. Com. App.) 218 S. W. 1038; T. & N. O. Ry. v. Harrington (Tex. Com. App.) 235 S. W. 188; St. L., S. F. & T. Ry. v. Morgan (Tex. Com. App.) 239 S. W. 607. In the latter case it was said:

"Whether automobile driver, who saw approaching train when train at the shortest possible distance, under the evidence, was 167 yards from the nearest edge of the crossing, and when automobile was only 8 feet distant from the track, was negligent in attempting to cross in front of train, held for the jury, in view of evidence, from which it could be inferred that he would have successfully crossed the track if engine had not been killed because of defects in crossing."

[9] In so concluding, we have not overlooked appellant's complaint of the court's refusal to give certain special issues, 9 in number, all relating to the issue of contributory negligence. The first was to the effect that a failure of one familiar with the crossing to exercise ordinary care to look and listen for the approach of the train, at a point from which it would be "effectual to discover the approach of such train," would constitute negligence.

The next was to the effect that if the driver and plaintiff, while on top of the hill on the approach to the turn in the road, knew they could not from that point tell whether a train was approaching or not, or on account of the noise of the automobile, and elevation of the ground or dump between them and the track, and that after—

"they traveled closer towards said crossing they could, by looking and listening, have discovered the approach of the train in time to stop or cause the automobile to be stopped, and that a person of ordinary prudence would have done so; that the fact that they had looked and listened at said point, where they could not see or hear whether such train was approaching, or not, would not excuse them from a duty to look and listen at such latter point, and in case of such negligence on their part, you will answer special issue No. 23 (a) and (b) and Nos. 24 (a) and 25 in the affirmative."

The next was to the effect that if the noise of the engine of the automobile in question interfered with or prevented the occupants of such automobile from hearing the approaching train, and—

"if you further believe that plaintiff, in order to exercise ordinary care for his own safety should have asked for or caused the automobile to be stopped before going on to said crossing, in order to better look and listen for an approaching train, and warn the driver thereof; and if you believe that by so doing he could have avoided the collision and consequent injury, you will answer special issue No. 24 in the affirmative."

Special requested charges 9, 19, 11, 13, 15, and 17 were of similar tendency. As before stated, we think the general charge of the court, together with the special charges requested by appellant, that the court gave and which we have hereinbefore quoted, sufficiently enlightened the jury on the issue of contributory negligence, and that to have given the additional special charges requested would have unduly emphasized that issue in appellant's favor. See, Ry. Co. v. Meakin (Tex. Civ. App.) 146 S. W. 1060; Fort Worth Belt Ry. v. Johnson, 59 Tex. Civ. App. 105, 125 S. W. 387; St. L. S. W. Ry. v. Haney (Tex. Civ. App.) 94 S. W. 386, to the effect that where a party requests more than one special charge covering the same issue, and the court gives the one more general in its terms, the party cannot complain of the refusal to give the others, though they are more specific.

[10] Nor have we overlooked the testimony of the witness Mrs. Woods and the witness Barksdale. Mrs. Wood, on one occasion several months after the accident, testified to the effect that she was nearly run over at this crossing by a train coming from the north; that she was going south toward Bridgeport, in a wagon, and did not discover the train until it was very close. The testimony of the witness Barksdale was of like effect. Appellant's proposition predicated upon this testimony is to the effect that "it is incompetent and irrelevant and prejudicial to the defendant, and that this was not the proper way to determine negligence."

In the case of St. L. S. W. Ry. Co. v. Mitchell (Tex. Civ. App.) 60 S. W. 893, it was

held, in an action for injury to the plaintiff's wife, caused by fright from a passing train at a crossing while plaintiff and his wife were driving together, predicated on defendant's failure to blow a whistle, as required by law, that it was competent for plaintiff to show that he had previously crossed at this place, and heard the whistle blown 400 or 500 yards before the train reached the crossing, as it tended to show his hearing was good enough to detect the whistle if it had been blown on this occasion, though it did not tend to show negligence in that respect at the time complained of.

This evidence could not, of course, form the basis of a finding of negligence on the part of appellant company in failing to blow the whistle or ring the bell on the occasion in question, but it is evident from the cross-examination of plaintiff's witnesses that the effort of appellant was to show that a person approaching the crossing in question could and would, in the use of ordinary care, both see and hear the approach of the train in time to either get across the track, or to stop and permit of the passage of the train. Indeed, later, during the course of the trial, appellant itself offered, by witnesses and photographs, evidence in support of its contention, and we do not feel prepared to say that it was reversible error to show that other persons than the driver and occupants of the car in question likewise had occasion to go over it, and that they, too, failed to hear or see the approach of the train. Nothing in the evidence is pointed out to show that the circumstances were so dissimilar as to require the rejection of this testimony. Other testimony of like tendency, and not objected to, seems also to have been given. For instance, Ed. Dickerson, a witness, testified that about a week after the accident he went to the crossing and made observations and that:

"At that time this grass was still there. I made observation there, to look up through that cut, to see how far up that cut a train could be seen. The grass was on the right of way there, and I made measurements from the rail out to the dirt road, north, where the boys approached, and you could see the smokestack of an engine, standing something like 12 or 14 feet from the track, when the train was about 5 or 6 rails up the track. There were 2 or 3 trains passed while we were there, freight and passenger. I made observations on those trains, as they passed through there, to see how far up the track I could see them. About 5 or 6 rails would be about 150 or 200 feet. I was standing about 14 feet back from the track at that time, on the dirt road. Passing back 14 feet farther from the track, I could not see those trains, not until they got almost right at the cattle guards; could not see them on account of their embankment and the grass and weeds. As you went still further back, until you got back up on the hill, you could not see the train at all."

[11] We do not recall any other question presented that is of material bearing upon the issues of appellant's negligence, as found by the jury in answer to special issues Nos. 16, 17, and 18, or findings on the issue of contributory negligence in answer to special issues Nos. 20, 21, 22, 23, 24-2, 24b. We think, therefore, that we may more briefly discuss remaining questions, it being undoubtedly a well-settled rule that the submission of immaterial issues and special findings thereon cannot affect the disposition of the case where the judgment is not in conflict with the findings upon material issues. Kelley v. Ward, 94 Tex. 289, 60 S. W. 311; T. & P. Ry. Co. v. Eddleman (Tex. Civ. App.) 175 S. W. 775.

[12, 13] The testimony of the engineer, Garrett, to which appellant objected, to the effect that "he regarded the crossing in question as dangerous," was not only harmless, inasmuch as the crossing was admittedly dangerous, but, furthermore, such knowledge in the mind of the engineer was relevant to the issue of negligence, on the part of the operatives of the train, in approaching the crossing at such a rapid speed without giving the statutory signals. The court, over appellant's objection, excluded the evidence of Barksdale, the owner of the automobile, in which the injured parties were riding, to the effect that he was engaged in the garage business at Chico, and running the car for hire as a service car, and that for the trip in question he had collected $3 from Dickerson, Hanna, and plaintiff Steele.

[14] The evident object of this testimony was to show that the occupants of the car were engaged in a joint enterprise, and that hence each was responsible for the contributory negligence of the driver. But while an effort was made in behalf of appellee, to show by the evidence that the plaintiff was but a guest of the driver, and hence that the driver's negligence would not be imputable to him, the issue, as it seems to us, is immaterial, in view of the fact that the jury found, by sufficient evidence as we think, that neither the driver nor Steele were guilty of contributory negligence in their approach to and effort to cross the railway track.

[15, 16] Complaint is also made of the action of the court in submitting to the jury, in various forms, the question as to whether the defendant was negligent, with reference to the condition of the approach to the crossing. It is insisted that the condition of the crossing could not have been a proximate cause of the accident. By chapter 8, of title 115, Rev. Statutes, article 6485, railway corporations are given the right to construct its road across public highways, but article 6494 of the same chapter expressly provides that it shall be the duty of the company in such case:

"To place and keep that portion of its roadbed and right of way over or across which any

\* \* \* country road may run, in proper condition for the use of the traveling public."

The evidence relating to this subject we think was clearly relevant, both to the issues of negligence on the part of the operatives of the train and to the alleged contributory negligence of the driver and occupants of the car; and the fact that the court required a finding as to whether or not such condition was the proximate cause of the accident is wholly immaterial, in view of the further finding that the negligence of the operatives of the train was the proximate cause.

[17] A like conclusion, we think, must be reached in considering appellant's objection to the court's submission of special issue 19, as to whether the employees of the train discovered that the car was going on the track in time for said employees to have stopped or checked the train, and avoided the accident by the use of all means in their power. An issue of discovered peril was presented in the pleadings and some evidence tended to support that issue, but the issue seems to be entirely immaterial in view of the fact that, upon other material issues we have discussed, the judgment may be supported.

[18, 19] It is further insisted that the finding of the jury in response to special issues Nos. 4, 5 and 6, to the effect that a traveler's view of the train going north was obstructed by weeds and grass, and that this was the proximate cause of the accident, was wholly unsupported by the evidence. We have already, to some extent, discussed this subject and the evidence was certainly relevant to the general issue presented, and to those upon which the judgment must be founded; but as to whether this condition of itself constituted the proximate cause of the accident is immaterial for the reason, as already mentioned, that a sufficiently supported finding of another proximate cause has been approved. For similar reasons, we overrule appellant's 13th, 14th, 18th, and 19th propositions, and conclude that the findings of the jury complained of in the 15th, 16th, 17th, 20th, 21st, 22d, and 23d propositions are sufficiently supported by the evidence.

[20] In appellant's concluding proposition, it is insisted that the finding of the jury in response to special issue No. 26, assessing the plaintiff's damage in the sum of $35,000, is grossly excessive and unsupported by the evidence. In T. & N. O. Ry. v. Syfan, 91 Tex. 562, 44 S. W. 1064, it was said that:

"In cases where there is no certain measure of damages (it has been said) the court will not substitute its own sense of what would be the proper amount of the verdict, and will not set aside a verdict for excessive damages unless there is reason to believe that the jury were actuated by passion or by some undue influence perverting the judgment."

In the case of Galveston, H. & S. A. Ry. v. Stevens, 94 S. W. 395, by the San Antonio Court of Civil Appeals, writ of error denied, in passing upon a contention that the verdict in that case was excessive he so pertinently and aptly expresses the rules by which we must be guided that we take the liberty of quoting in full what Judge Fly said upon the subject in that case:

"While primarily we would not have given the amount of damages allowed by the jury, we believe, under the authority of decisions of this and other appellate courts of Texas, that the power of this court in cutting down verdicts is confined to those cases where there is some indication of prejudice or passion on the part of the jury. Railway v. Syfan, 91 Tex. 562, 44 S. W. 1064; Railway v. Hynes (Tex. Civ. App.) 50 S. W. 624. Of course, the amount of the verdict alone might be such as to conclusively demonstrate that improper motives influenced the jury in returning it. The amount found in this case we conclude, after a review of numerous cases, cannot, in the absence of other evidence, be held to demonstrate passion or prejudice on the part of the jury. Railway v. Nass (Tex. Civ. App.) 57 S. W. 910; Railway v. Moynahan (Tex. Civ. App.) 76 S. W. 803; Railway v. Vanlandingham (Tex. Civ. App.) 85 S. W. 847; Railway v. Kelly (Tex. Civ. App.) 80 S. W. 1073; Postal Tel. & Cable Co. v. Coote (Tex. Civ. App.) 57 S. W. 912; Railway v. Cody (Tex. Civ. App.) 50 S. W. 135. In the case of Railway v. Brazzil, 78 Tex. 314, 14 S. W. 609, the Supreme Court, after setting forth the injuries sustained by a plaintiff who had recovered a judgment for $20,000 actual damages arising from personal injuries, said:

"'Under such circumstances we cannot say that the amount of the actual damages awarded is the result of passion or prejudice in the minds of the jury, and therefore cannot reverse the judgment on account of the amount of the recovery only.'

"It is true that decision was rendered at a time when the Supreme Court had no authority to suggest remittiturs, but could only reverse in case of an excessive verdict, but it has been held by this court that the rule is the same since the adoption of article 1029a, Rev. St. 1895, as before that time, in regard to interference with a verdict on the ground of excess. Railway v. Hynes (Tex. Civ. App.) 50 S. W. 624. Before that law was enacted judgments were reversed when it was deemed that the amounts showed passion or prejudice on the part of the jury. Since that time the Courts of Civil Appeals have had the power to require remittiturs in such cases. The authorities cited in the Hynes Case amply sustain the rule it enunciated. In the case of Railway v. Toliver (Tex. Civ. App.) 84 S. W. 375, the verdict was for $19,500 for damages arising from personal injuries, and the Court of Civil Appeals of the First District said:

"'While the verdict is a large one, we find nothing in the record to indicate that in fixing the amount the jury acted from any improper motive. Such being the case, we are not authorized to substitute our judgment as to what would be a fair compensation for the injury sustained by appellee for that of the jury. The law leaves it to the jury to fix the compensation in all cases of this character; and, unless

the amount found by them is so unreasonable as to justify the conclusion that they were improperly influenced, their verdict should not be disturbed.'

"That was said in a case in which the plaintiff had his leg so crushed that it had to be amputated a few inches below the hip joint. In the case of Railway v. Lehmberg, 75 Tex. 61, 12 S. W. 838, the court discussed the rule as to verdicts of juries complained of as excessive, and said:

" 'They are expected to act uninfluenced by passion, prejudice, or partiality, and to pay due regard to the ascertained facts and conditions surrounding the subject. When it appears to the court that they have disregarded these requirements, their verdict should be set aside. On the other hand, when the court is unable to determine that these things have not been observed by the jury, and when it does not appear that the verdict is not the result of the honest endeavor of the jury to follow their own convictions in the exercise of a power not precisely defined, we think the law intends that the jury's estimate, rather than the equally undefined one of the judges, shall prevail.'

"The same rule as to excess in verdicts is adopted in Missouri and other states. In the case of Waechter v. Railway (Mo. App.) 88 S. W. 147, it was said:

" 'In this character of case the damages cannot be mathematically calculated. They should be estimated on the basis of compensation. Pain of body and mental anguish resulting from an injury are elements that enter into the estimate of the damages. The uncertainty of correctly estimating what is a fair money compensation for pain of body and mental anguish is shown by the wide differences in the amounts assessed by juries in similar cases. We might go further, and say that the reported cases also show a like contrast in the judgments of the appellate courts as to what are excessive damages. We think this is due more to temperament than to sound conservative judgment. The question is one which must necessarily be deferred to the jury and trial court, as they are in a much better position, from having seen and heard the plaintiff and all the other witnesses, to correctly estimate the damages, than is the appellate court, who neither sees nor hears any witnesses; and we do not think it is wise practice for appellate courts to interfere with the verdicts of juries on account of the damages assessed, and take upon themselves the task of estimating them, in this class of cases. The verdict of the jury should not be disturbed unless the damages assessed are so excessive as to shock the moral sense, or it clearly appears that the jury was influenced by passion or prejudice.' "

[21] Applying the rules thus stated, we feel unable to disturb the findings of the jury and the judgment of the court thereon in fixing the amount of appellee's damages. Not a circumstance in the evidence is pointed out which tends to show that either the jury, in fixing the amount of appellee's damages, or the trial court in approving said amount, was influenced by prejudice or passion. At the time appellee received his injuries, on July 29, 1920, he was 28 years of age, and in the prime of life. He had been working as a section hand on the railroad of defendant from 1912 to some time in 1917, when he enlisted in the United States army and was sent to France, where he remained until 1919, when he was mustered out and sent home. At other times he worked in various capacities, incuding that of an apprentice foreman of a section on the rairoad, receiving the usual wages therefor. Testimony shows that he was an industrious, steady worker and rarely without employment. Up to the time of the accident his health was good and it was shown that he had a life expectancy of 36 years. It was undoubtedly shown that his injuries were serious and permanent, and that there is no hope that he will ever recover, even to the extent of being able to attend to his own physical requirements, except to a limited extent. In short, the evidence tends to show that he is and must remain, during the remainder of his life, a complete physical wreck, so entirely helpless as to require others to care for him. The night of the accident the plaintiff was taken to a hospital in the city of Fort Worth where, as the evidence shows, he remained unconscious for eight weeks before he could recognize his mother, who was with him all the time. It was shown that during that time he suffered greatly, slept but little, and required the administration of drugs to keep him quiet; that a broken leg was first set and afterwards opened, and an attempt made to bring it together with a grafted bone, which, however, failed to adhere and was taken out; that his leg is not yet well; that plaintiff was taken to his home but not able thereafter to so recover as to walk or transport himself on crutches; that he is nervous and sleeps but little, particularly in the fore part of the night; that his face is paralyzed; that he is only able to get about home, and probably at other places, in a chair; that he requires others to wait on him; that he gets from home but seldom, going to town once in a while when some friend comes and gets him in a car; that he has never been able to do any work since the accident.

Appellee's sister, Hattie, testified that she first saw appellee on Saturday morning after the accident, and that his condition at that time—

"was as bad as he could be to be alive, I think; he was just throwing his hands and groaning, he did not recognize me when I went in; they were not doing anything with him. I remained with him there about six months and a half; I don't remember when he first came to himself, so he could recognize me, but it was just about eight weeks, I guess. He did not recognize anybody else during that eight weeks. He did not recognize us enough to know it was us if we would go away where he could not hear our voice. He could not get up and wait on himself. A nurse waited on him. He had a nurse eight months and five days. He

suffered all the time, I could tell from the way he done. He just took on. Of course he would grunt and groan. His sleep was broken. * * * Since he has been at home he has not been able to do anything. He cannot wait on himself. He don't sleep good; he is nervous. I have noticed something the matter with his face; it is paralyzed. As to his memory, he does not remember as well as he did before the accident. His leg is not completely healed.".

Plaintiff himself testified to the effect that after getting in the car to go to Bridgeport the first thing that he knew was the doctor taking the drain tubes out of his leg, in the sanitarium at Fort Worth; that he was taken to the sanitarium on the 29th day of July, 1920, and came home on the 3d day of April, 1921; that at the time he got in the car at Chico to go to Bridgeport his physical condition was good; that he has never been able to walk since the accident; that his head hurts him nearly all the time; that he has the headache nearly all the time and had never had it before; that the muscles of the right side of his face are paralyzed; that his bowels are hard to move; that—

"before the accident I could sleep about the time I hit the bed, but now I just can't sleep, that leg hurting me, paining me, and head aching; I haven't any use of the leg, only in the ankle joint. I can bear my weight on it, but not long at a time."

He further testified that since the accident his nerves and memory had been bad; that he is unable to do work of any kind, clerical or otherwise; that he has no business education, and there is nothing that he can now do, that he knows of, to earn anything.

Dr. Petty testified to the effect that appellee had an open wound, that discharges, which has failed to heal up, the bone being entirely out of line; that the knee joint is "anchylosed, a good deal of deformity to the right"; that the right side of appellee's face seems to be drawn to the right; that the condition of the right side of appellee's face is permanent and evidently caused by some injury of the brain.

Other testimony of like purport was submitted and we have examined a number of cases where verdicts for damages for personal injuries, ranging from $30,000 to $35,000 have been approved, such as the cases of St. L., B. & M. Ry. v. McLean (Tex. Civ. App.) 241 S. W. 1072; Schaff v. Ellison (Tex. Civ. App.) 255 S. W. 680; T. & N. O. Ry. v. Harrington (Tex. Civ. App.) 241 S. W. 250; Baker v. Fields, 236 S. W. 170; Hines v. Mills (Tex. Civ. App.) 218 S. W. 777; and, on the whole, we conclude that, as before stated, we must overrule appellant's assignments and propositions relating to the alleged excessive verdict, and not otherwise

having found reversible error, we finally conclude that all assignments and propositions must be overruled and the judgment affirmed.