**CHICAGO, R. I. & G. RY. CO. v. DICKERSON.　(No. 10879.)***

(Court of Civil Appeals of Texas. Fort Worth. Feb. 21, 1925. On Appellee's Motion for Rehearing March 14, 1925. On Appellant's Motion for Rehearing April 11, 1925.)

1. Railroads ⊜⟶347(5)—Admission of evidence of change in ·embankment near crossing after accident not error.

Evidence that after accident change had been made in embankment near crossing which was claimed to have obscured approach of train *held* not reversible error, in view of instruction that such evidence could not be considered as having tendency to show negligence by defendant, and in view of admission of photographs which such evidence tended to explain.

2. Death ⊜⟶99(3)—$7,500 for death of 16 year old boy held excessive by $3,500.

Verdict of $7,500 for death of 16 year old boy, who spent most of time at school, *held* excessive by $3,500.

Appeal from District Court, Wise County; F. O. McKinsey, Judge.

Action by Ed A. Dickerson against the Chicago, Rock Island & Gulf Railway Company. Judgment for plaintiff, and defendant appeals. Affirmed on condition of remittitur.

Lassiter & Harrison, of Fort Worth, and McMurray & Gettys, of Decatur, for appellant.

J. A. Templeton, of Fort Worth, and M. W. Burch, of Decatur, for appellee.

CONNER, C. J. This suit was instituted in the district court of Wise county by Ed A. Dickerson against the Chicago, Rock Island

& Gulf Railway Company to recover damages for the death of his son in a collision between one of the defendant's passenger trains and an automobile, in which his son was riding, near Chico, Tex., on July 29, 1920. This is a companion case to the case of Chicago, Rock Island & Gulf Railway Co. v. Steele, reported in 264 S. W. 503, writ dismissed. The defendant was alleged to have been negligent in operating the train at an excessive speed, in failing to sound the statutory signals for the crossing where the accident occurred, in failing to keep a proper lookout, and in permitting grass and weeds to grow on its right of way near the crossing, which obstructed the view of travelers.

The defendant answered by way of a general denial, and alleged that by the use of any care whatever the occupants of the automobile could not have failed to discover the approach of the train before they went on the crossing, and that they were guilty of contributory negligence in going on the crossing immediately in front of the train.

The automobile was driven by D. Blocker, in which the son of plaintiff and four other young men were riding; plaintiff's son being seated on the back seat. The automobile was traveling at an estimated speed of 15 miles an hour, and proceeded along the public road for a distance of several hundred feet parallel with and immediately adjacent to the railroad right of way. The road made a right angle turn at a distance of about 100 feet from the track, and from that point proceeded west directly across the track. The roadway for the last 30 or 40 feet of this distance was rough, and while traversing that distance the automobile slowed down to a speed of 3 miles an hour. The train in question approached from the north at a speed variously estimated at from 45 to 60 miles an hour and struck the back end of the automobile and hurled it and its occupants forward and outward, resulting in the death of plaintiff's son and serious injuries to the others. At a point several hundred feet north of the crossing, a cut began which was about 14 feet deep, 1,000 feet from the crossing, and about 5 feet deep, 200 feet north of the crossing. There was considerable evidence tending to show that the right of way was incumbered by grass and weeds north of the crossing, which tended to obstruct the view of approaching persons. There was also evidence tending to show that the crossing was 14 feet lower than a point on the track 1,400 feet north of the crossing, and that there was a slight curve 75 or 100 feet north of the crossing.

The evidence, issues, and findings in the Steele Case and in the present case in the material particulars are so nearly identical as to make it unnecessary for us to now and here enter into a more minute description, for in the opinion in the Steele Case will be found a full discussion of the circumstances.

Indeed, appellant, in its typewritten argument in support of its motion to file briefs in this case, had this to say:

"It is further respectfully shown that the present case is a companion case to the Steele Case, in which Judge Templeton represents the appellee, and in which both parties filed elaborate briefs in this court a few months ago, and that there is very little matter in the appellant's brief in the present case that was not in the Steele brief, and very little matter that will be required in the appellee's brief in the present case that was not in the appellee's brief in the Steele Case."

And in addition thereto, in its printed argument in support of its motion for rehearing on our order denying the motion to file briefs, further said:

"This case is to recover damages for the death of one of the boys who was riding in the automobile with Steele, whose case was briefed a few months ago by the attorney for the appellee here, who was also Steele's attorney, and the two cases are in all respects identical, except that a recovery for personal injuries is sought in the Steele Case, and a recovery for compensation for the death of the plaintiff's son is sought in the present case. As appears from the briefs, and as was stated in the appellant's motion without dispute by the appellee's attorney, there is very little in the present case which was not fully briefed and argued in the Steele Case. To be precise about it, there is nothing new in this case except evidence of changes at the crossing after the accident, and that the verdict of the jury allowing the plaintiff compensation for the death of his son is excessive."

We accordingly address ourselves to the two new questions thus alleged to be involved in the present suit.

[1] The court admitted the evidence of C. T. Wood, J. D. McIlhenny, and J. C. Barnhill, to the effect that during the fall of 1920 or early part of 1921, a change had been made in the cut just a little north of the crossing in question; that the employés of the railway company had, with a steam shovel, worked out some 8 feet on each side of the cut and raised the road bed on the north side, thus widening the cut from 1 to 3 feet, as shown in photographs marked Exhibits C and B, introduced in evidence by the plaintiff. To this testimony the defendant objected, alleging that it was irrelevant and prejudicial, "in that it was calculated to lead the jury to believe that the change in the embankment and the cut was a confession by the defendant that it was negligent in permitting the embankment and cut to be in the condition existing at the time of the accident."

In the case of G., C. & S. F. Ry. Co. v. McGowan, 73 Tex. 355, 11 S. W. 336, the plaintiff sought to recover damages for the destruction of crops from an overflow, and on the trial was permitted to prove that certain culverts, presumably constructed for the purpose of carrying off water, had been changed

or enlarged after the overflow which destroyed the crops. The evidence was objected to as irrelevant, incompetent, and illegal in that it tended to confuse and mislead the jury, and because it was an attempt to make the acts of the defendant after the time of the alleged damage to plaintiff's crops an admission that the culverts were not theretofore sufficient for the purpose for which they were intended, and because the negligence of the defendant was to be judged by the facts as they were before the overflow, and not by subsequent experience. The Supreme Court ruled that the objection should have been sustained and quoted with approval the following from a preceding case to wit:

"As a general rule, upon principle as well as matter of public policy, such evidence ought not to be admitted. It is a matter of common knowledge that railroad tracks and machinery as well as all other instrumentalities used in operating trains are continually undergoing repairs and being improved. Undoubtedly the public is greatly interested in the continuance of such improvements. Where accidents have directed the attention of the company to a particular portion of the roadbed or other instrumentality that by additional safeguards would be rendered more safe, to hold as a general rule that if the desired improvement is made that the company thereby admits that it had been negligent would result in deterring the company from promptly making the improvement. Indeed, it would be a harsh rule if every change for the better is to be considered as evidence showing former negligence."

In the case of Texas Trunk Ry. Co. v. Ayres, 83 Tex. 268, 18 S. W. 684, a similar ruling was made; the McGowan Case being cited with approval. See, also, Ry. Co. v. Mitchell (Tex. Civ. App.) 139 S. W. 926; Ry. Co. v. Arnold, 39 Tex. Civ. App. 161, 87 S. W. 176.

As will be seen from the Steele Case, there was considerable evidence tending to show that at the time of the accident the view to the north, the direction from which the train approached, was to a greater or less extent obstructed by high grass and weeds that had been permitted to grow upon the right of way. Photographs marked Exhibits B and C, introduced by the plaintiff, were shown to have been taken some months after the accident, and therefrom the view to the north was apparently enlarged and clarified.

Also occupants of the automobile testified, in substance, that they looked and listened before attempting to cross the track and neither saw nor heard a train approaching until within about 3 feet of the track when Blocker, as he testified, was then unable to stop, and speeded up in the effort to cross ahead of the train. These witnesses also testified, in substance, that in approaching the crossing they could not see an approaching train until they were within some 12 feet of the crossing. Photographs marked Exhibits C and B were introduced by the plaintiff, as

272 S.W.—35

stated, without objection on the part of the defendant, and at the time of the introduction of the testimony under consideration the court gave this instruction to the jury, to wit:

"Gentlemen of the jury, the only purpose for which the evidence is admitted would be to assist you, if it does, in determining the actual condition of the road and surroundings at the crossing at the time the accident occurred, especially in view of the pictures that have been taken, that have been introduced in evidence, taken, I believe the photographer said, in January, 1922. This is the only purpose for which the evidence is offered."

We also note in this connection that later during the course of the trial the defendants also introduced some six or more photographs which the testimony shows were taken the day after the accident. These photographs present the general contour of the country at the time, the approach to the crossing, the different points along the approach to the crossing at which an approaching engine stationed on the track could be observed, and so on. It appears that these photographs offered by the defendant had been taken in the daytime, with the camera at an elevation of 5 feet and 4 inches, the estimated elevation of a man seated in a Ford touring car. The photographs offered by the plaintiff, however, were taken at a camera elevation of 3½ feet, and the testimony shows that the collision occurred about dark on the evening of July 29, 1920; one witness testifying that it was just about "good dark." And the court, at the request of the defendant, charged the jury:

"Gentlemen of the jury, you are instructed that any evidence admitted before you concerning any changes or differences in the condition of the ground, right of way, or public road at the crossing in question, since the accident in question as compared with same at the time of the accident, was not admitted for consideration by you as having any tendency to show that the defendant was negligent in respect to any of the matters submitted to you in the special issues which you are to answer, and such evidence cannot be properly considered by you for such purpose, and you are instructed not to consider for such purpose any such evidence."

We conclude that, under all the circumstances above stated, no reversible error was committed by the trial court in admitting the testimony objected to, and the assignment and propositions relating to this question will accordingly be overruled. The reason of the rule which inhibits testimony showing changes in the track or structures entering into the consideration of cases of the kind is that thereby a jury may draw inferences of negligence to the prejudice of the defendant. In this case no such inference could be drawn, if the jury heeded the instruction of the court, and nothing in the record indicates that the jury did not do so. While the relevancy of the photographs B and C is not very plain, unless to show the general topog-

raphy of the locality, yet no objection was made thereto and, having been introduced, they tended to show an unobstructed track and a wider area of vision, which was explained by the testimony of witnesses relating to the clearing and widening of the cut. The rule relating to changes invoked has its exceptions. To illustrate, in the case of Armour & Co. v. Morgan (Tex. Civ. App.) 151 S. W. 861, the plaintiff complained of an injury to his hand which it was contended could have been avoided by a guard or fender over that part of the machinery which caused the injury. One of the defendant's contentions was that it was not practical to so construct or place a guard. The plaintiff was permitted to prove that after the accident, the company in fact had constructed a guard and fender as plaintiff insisted should have been done, and the court held that under such circumstances the evidence of the subsequent change was admissible. The case was reversed by our Supreme Court on a writ of error, but the ruling noted was not disturbed.

The case of St. L., A. & T. Ry. Co. v. Johnston, 78 Tex. 536, 15 S. W. 104, was one in which the surviving wife of an engineer sued the railway company for damages and injuries to her husband, resulting in death caused by the derailment of an engine which he was operating. The negligence alleged against defendant was in failing to properly construct its road so as to prevent sand from washing upon its track at a crossing. The trial court permitted, over the defendant's objection, several witnesses in behalf of plaintiff to testify that defendant subsequently to the accident made changes in its road at the crossing where the accident occurred, and the ruling was made a ground of complaint on appeal. The Supreme Court, in disposing of the question, had this to say:

"This court has held that it is not competent in order to show a negligent and faulty construction on part of a railroad to prove that subsequent to the occurrence which gave rise to the cause of action they had altered the work. Railway v. McGowan, 73 Texas, 355. The obvious ground is that the mere fact that a company after the happening of an accident has attempted by an alteration to render their structures more secure is no evidence that they knew or ought to have known them to be faulty before the accident occurred. A contrary rule would deter companies from making improvements which might affect existing litigation, and for that reason the rule as adopted by this court commends itself on the ground of public policy. But in this case the bill of exceptions shows that the testimony was admitted upon two grounds. One was to explain a photograph of the crossing which had been taken after the accident had happened and after the changes had been made, and which had been introduced in evidence. There being a contention on part of the defendant that the washing of sand upon the crossing could not have been prevented, the other ground for its admission was that it tended to prove that the defect could have been remedied. If the change had been made by the city and the danger had been obviated, the fact would even then have been good evidence as showing that it was practicable so to construct the crossing, as that sand would not wash upon the track. The testimony was competent and relevant for the purposes for which it was admitted, and the cases cited by appellant do not apply. If a charge had been asked on behalf of defendant to the effect that the mere fact that the company had changed the crossing after the accident was not of itself evidence of negligence, it should have been given."

In the case of Texas Midland Ry. Co. v. Truss, 186 S. W. 249, by the Texarkana Court of Civil Appeals, writ refused, the plaintiff complained of an injury caused by striking his head against an iron rod that was maintained to operate a signal board on the defendant's depot platform. Negligence on the part of defendant was alleged on the ground of its failure to have maintained the operating rod at a sufficient height to enable passengers to safely use the platform. The defendant company denied this allegation and pleaded to the effect that it was necessary that said rod should be placed at about the height it was placed above the platform in order that defendant's telegraph operator could operate it. Under such circumstances the Court of Appeals upheld the ruling of the trial court admitting testimony that since the injury the defendant company had raised the operating rod one foot.

Under the circumstances detailed and the authorities herein last above cited, we are of the opinion that the trial court did not commit reversible error in admitting the testimony complained of relating to the changes made in appellant's road bed and cut at the crossing where the injuries occurred.

[2] We have concluded, however, that the judgment for $7,500 is excessive, as alleged in appellant's one hundred ninth assignment of error. We will not quote the testimony in full, but endeavor to give briefly its substance. Plaintiff's wife, Mrs. Grace Dickerson, the stepmother of the deceased, testified that she had known him since he was five years old; that he would have been 17 years old on the 21st day of October following his death, on July 29, 1920; that he was not disposed to be wild and run away; that he never stayed on the streets or run around town; that he attended school regularly; that during vacations he helped with the housework when he did not have work of some kind elsewhere; that he would always help with the work in the house and around the place; that he would wash dishes, make beds, or do anything else that was to be done just as good as any girl; that he had been raised that way at home; that he assisted his father about the store during holidays, or whenever he was needed; that he worked some at a rock crusher, did not remember just how long; that he usually gave what money he earned to her, which

was used as the family saw best; that the deceased was careful and economical with his money; that on vacation he went out to Jermyn and was gone out there something like six weeks, which was the only time he was ever away from home; that he worked at Jermyn, but she did not know how much he made; that he was very kind and affectionate both to his father and to the witness.

Mrs. Williams testified that she was a sister of Mrs. Dickerson and knew the deceased in his lifetime; that he was not a spendthrift, was not lazy, and she judged him to be an "all round A1 boy"; that he was good about working on the place; was affectionate and kind towards his parents; was never away from home but one time, and just left them to go to work; was only gone about six weeks, something like that; that he always kept busy; he was good about helping father at the store.

On cross-examination this witness testified that she lived about three blocks from the home of the deceased and worked in the store together with a Mr. Alexander; that the plaintiff, Mr. Alexander, and witness were all that worked there besides the deceased, and that the three named were sufficient to take care of the store except on busy days; that during the busy season, or holiday season, when the deceased was not in school, he helped; that holiday season generally came in schooltime. The witness would not say how many times the deceased worked at the store, but said, "Of course, he worked as much as a month altogether"; that he did not receive any pay for his work there; that when he had money he either gave it to his stepmother or kept it at the State Bank, but had never heard him say the amount he may have had at any one time; that at one time he worked for Mr. Mosier, across the street, in the yard, and did things like that; that he helped the witness clean house more than once, and sometimes she paid him, and sometimes did not pay him anything. She was asked: "Did you pay him in all as much as $2?" She answered, "I couldn't say; I don't remember." This witness further testified that the deceased was ambitious to go to school; that he always went and was always ready to go; that he was ambitious to go higher than Chico, where the parties in question lived; that she had heard him express himself as wanting to go to A. & M. College; heard him say that was his intention when he finished at Chico; that he would have finished at Chico the following year after he was killed; then he wanted to go to A. & M. was what he said; that she had never heard the father of deceased encourage him in his ambition, but that his stepmother surely wanted him to go; that she had heard her say so; that it was her intention to send him to school higher.

The plaintiff, being recalled, testified that he did not have any definite plans about sending Bonner to school after he graduated from the Chico school; that he had talked about going to A. & M. College, and had he been able he, of course, would have been glad to send him, but owning only a small part of the store, and the condition he was in, some land notes he had hanging over him to pay off, he wouldn't stand any chance to send him for quite a while. He further testified that he had two small children besides Bonner, a baby about a year old and the next one about five years old; that every evening Bonner would come down to the store and help him when he had anything that it was necessary for him to do. That he had one cow; that:

"My goods, wares, and merchandise would invoice something like $6,000 or $7,000, kind of general store for a grocery. I do not own that store myself. I own part of it. My mother is in partners with me. Besides that I own a house and lot is all. I have got one lot in Fort Worth—small lot way out on the south side. It is not rented. It is just a vacant lot. I also have 18 acres of land worth about what I owe on it, in Henderson county—timbered land. We have two clerks in that store. They are Alexander and my sister-in-law, Mrs. Williams. We are paying Mr. Alexander $75 a month, and the young lady the same amount. The average wages at Chico for real clerks in a store I guess run anywhere from $75 to $100. * * * Bonner had worked in the store while I would need him for a day. Nothing compulsory about it, but always helped me when I called on him."

Mr. Maddox testified that he was the timekeeper for the Lone Star Stone Company, and that the deceased had worked for that company from June 19th to June 30th, drawing 30 cents an hour; that he worked 12½ hours on July 1, 10 hours on July 2, 5 hours on July 5, 9 hours on July 13, 10 hours on July 14, and 5 hours on July 15, which covered his entire employment with that company; that he had been "let out," together with some other boys on account of being under 17 years of age.

There can be no dispute as to the legal principle controlling the measure of plaintiff's right of recovery. Article 4704, Rev. Statutes, relating to injuries resulting in death, reads as follows:

"The jury may give such damages as they may think proportioned to the injury resulting from such death; and the amount so recovered shall be divided among the persons entitled to the benefit of the action, or such of them as shall then be alive, in such shares as the jury shall find by their verdict."

The statute does not limit, as at common law, the parent's right to the wages of the minor less the cost of his maintenance until 21 years of age, but admits of an assessment beyond this, if in the judgment of a jury it is necessary in order to afford just

compensation to' the parent whose minor child has been lost by the wrongful or negligent act of another. The statute having committed to a jury the responsibility of determining the amount of damages to be awarded to the parent in such cases, the courts uniformly manifest the greatest hesitation in disturbing their finding. Ordinarily, as we said in the Steele Case:

"In cases where there is no certain measure of damages (it has been said) the court will not substitute its own sense of what would be the proper amount of the verdict, and will not set aside a verdict for excessive damages, unless there is reason to believe that the jury were actuated by passion or by some undue influence perverting the judgment.".

But, while in the case before us we have been pointed to no circumstance beyond the size of the verdict tending to show passion or prejudice on the part of the jury which tried this case, yet it should nevertheless be held that the verdict in cases susceptible of proof, as in this case, must rest upon evidence which fairly supports it, and not upon mere conjectures or possibilities. As said in the case of West Lumber Co. v. Hunt (Tex. Civ. App.) 219 S. W. 1112:

"The father would be entitled in this case to the value of the services of the deceased, whatever such value would have been, up to the time the son would have reached his majority. * * * And, in addition to that, * * * the father would also be entitled to recover the value of such contributions or aid of a pecuniary nature as he had a reasonable expectation of receiving from the son after reaching his majority, had he lived. But the amount of this element of recovery, however, would have to be arrived at and based upon evidence before the jury, and could not properly be left to their determination upon mere surmise or speculation. * * * There was no proof on the trial below showing or tending to show that the deceased had made any promise to consecrate himself to his father, or that he would support or contribute to the support of his father or family, after reaching his majority, and there is nothing in this record, other than the fact that the boy was a dutiful and obedient and affectionate son, to warrant a conclusion that [he] would have continued to contribute anything to his father after reaching majority, and the verdict of the jury in favor of defendant in error for the sum of $5,000 must be based alone, we think, upon evidence to the effect that the relation of father and son existed, and that their relations were affectionate, and that the son was considerate of and obedient to the father, and considerate of his brothers and sisters. * * * Yet we also know, as has been frequently determined by the appellate courts of this state, that the verdict of a jury on such issue must have a reasonable and substantial basis in the evidence, and that a jury cannot be permitted to speculate or merely surmise in determining such issue, and, as we view the record in this case, that is what the jury has done in reaching a verdict in favor of defendant in error for $5,-

000. We hold that the assignment challenging the verdict and judgment as being excessive ought to be sustained."

It seems to us more than probable from the evidence that, during the deceased's continued minority, the plaintiff would not have received a net pecuniary benefit from the services of his son in excess of the cost of his maintenance. The evidence seems undisputed that the boy was ambitious for an education and was intending to attend the A. & M. College after his graduation from the local school, and that both his father and mother intended to send him there if they could. This being their intention, it seems quite certain that, had they not been able to supply the necessary money out of their own resources they would have been more than willing for the boy to have devoted his own earnings to that purpose if he could have earned enough to take him through school, and that the plaintiff would have received any pecuniary benefit from the boy after maintaining his majority seems purely conjectural. Appellee cites cases where verdicts as large or larger have been approved, such as Brunswig v. White, 70 Tex. 504, 8 S. W. 85; Ry. Co. v. Watkins (Tex. Civ. App.) 245 S. W. 794; Ry. Co. v. Hardin (Tex. Civ. App.) 251 S. W. 814; Schaff v. Young (Tex. Civ. App.) 264 S. W. 582; Baker v. Fields (Tex. Civ. App.) 236 S. W. 170. But the cases on examination, we think, will be found not to have been predicated upon circumstances precisely as those in the case before us. In some of the cases the child or children killed were of tender age, where, in the very nature of things, evidence of their probable earnings or probable contributions to their parents before and after majority could not be shown. In others it was shown that the parent was aged or infirm and to a greater or less extent dependent upon the deceased. But such circumstances do not appear here. In this case deceased was of an age and character capable, if necessity required, of earning money, and the age, state of health, or financial condition of the parents has not been shown to be such as to render contributions from the deceased at all necessary or probable. It was certainly shown that he was ambitious, of good habits, and desirous of not only completing his education in the local school, but of later attending institutions of higher learning, and that both parents at least sympathized with him in such ambition and would have helped him in its attainment, unless prevented by want of financial ability to do so; and there are no weighty circumstances pointed out in the evidence which tend to show that the financial ability of plaintiff was in hazard or would probably be less than that existing at the time of the son's death.

In the case of Texas Cement Co. v. Lee,

36 Tex. Civ. App. 482, 82 S. W. 306, writ refused, it was said:

"It does not appear from the evidence that [the parents] had any reasonable expectation of receiving any pecuniary benefit from him in the future, had he lived. It was essential for the parents of deceased to show that they had suffered some pecuniary loss by reason of his death in order to authorize a verdict for any amount in their favor. This they failed to do."

In the case of G., C. & S. F. Ry. Co. v. Hicks (Tex. Civ. App.) 166 S. W. 1190, the parents were awarded a judgment for $5,500 on account of the death of their son, but the appellate court felt bound to require a remittitur of $4,400. In reaching that conclusion, the court said:

"But, conscious as we are of the fact that 'the damages in such cases are essentially indefinite,' * * * and of the fact that the statute declares that in such cases 'the jury may give such damages as they may think proportioned to the injury resulting from such death,' * * * and loath as we are to substitute our own judgment for that of the jury as to the proper amount to award as damages, we nevertheless are agreed that under the circumstances shown by the testimony the verdict and judgment are so plainly and radically excessive they should not be permitted to stand. It is clear, we think, when the financial condition of appellees is kept in mind, that it was extremely improbable that appellees ever would have needed pecuniary assistance, and therefore that the assistance of that nature which deceased reasonably could have been expected to render to them would have been trivial, and that a much smaller sum than $5,500 would have fully compensated appellees for the loss of that nature suffered by them."

Perhaps other cases could and should be discussed, but the cases differ so in circumstances as that we do not feel that it would be profitable to do so. Excluding consideration of the sorrow and distress of mind caused by the unfortunate occurrence, as we are required to do, we conclude that $2,500 will be sufficient pecuniary compensation to the plaintiff in this case for the death of his son.

Appellant again vigorously insists that the undisputed evidence shows that the driver of the car and its occupants, including deceased, were guilty of negligence which proximately contributed to the injury. But we think the evidence in this case is not materially different from the evidence developed on the trial of the Steele Case, and we there held and now continue to think that the evidence as a whole is sufficient to establish the jury's findings to the effect that the appellant company was guilty of negligence, and that neither the driver of the car nor any of its occupants were so lacking in the exercise of ordinary care as to constitute contributory negligence.

Other questions, having been fully discussed in the Steele Case, will not be here noticed, but for reasons therein stated all assignments and propositions relating thereto will be overruled.

So that, we conclude, on the whole, that the judgment should be reversed because of its excessiveness, unless appellee shall file in this court a remittitur of $5,000 within 20 days from this date. In event such remittitur shall be filed, the judgment will be affirmed for the remainder.

### On Appellee's Motion for Rehearing.

On a reconsideration of the question presented in appellee's motion for rehearing, we have concluded that, while we are of opinion that the verdict in this case is excessive as determined on original hearing, we erred in requiring, as a prerequisite to an affirmance of the judgment, a remittitur of $5,000. We deem it more just to fix the amount of the access at $3,500 instead of $5,000. It is accordingly ordered that our former opinion and judgment be reformed so as to conclude that the judgment of the trial court will be reversed because of the excessive verdict, unless appellee shall, within 20 days from this date, file a remittitur in this court in the sum of $3,500, in which event judgment below will be affirmed in appellee's favor for the sum of $4,000, with the costs of appeal taxed against appellee.

### On Appellant's Motion for Rehearing.

In considering appellant's motion complaining of our recent order allowing a recovery herein of $4,000, we wish to say that, in considering the amount of the jury's verdict and judgment in this case, we all originally agreed that we thought the judgment was excessive, but as to the amount of excess there has not been at any time an entire agreement among us. Our first order requiring a remittitur of $5,000, as also our second order fixing $3,500 as the amount of excess, was to a greater or less extent the result of an effort on our part to compromise our various inclinations. Like conflicts of opinion continue to exist in the consideration of the motion now before us, but the majority have concluded that in stating the facts in our original opinion we possibly adopted too strict a construction of the evidence, and that we should now say that the evidence does not entirely preclude the conclusion that at least some service and pecuniary benefit to the appellee would have been received during the minority of his son, and possibly thereafter, and hence considering the wide latitude given the jury in determining the amount of compensation that should be allowed in such cases, we should not now require a further remittitur so as to reduce the amount of the judgment in appellee's favor below the sum last fixed, to wit, $4,000.

The motion is accordingly overruled.